**John P. BUCKROYD, by his next friend and mother, Mary Buckroyd, and Mary Buckroyd, Individually, Appellants,**

v.

**Ronald K. BUNTEN and John H. Kelley, Appellees.**

No. 2-57228.

Supreme Court of Iowa.

Jan. 21, 1976.

Robert W. Brennan, of Stewart, Wimer, Brennan & Joyce, Des Moines, for appellants.

Michael Figenshaw, of Bradshaw, Fowler, Proctor & Fairgrave, Des Moines, for appellees.

Heard by MOORE, C. J., and MASON, LeGRAND, HARRIS and McCORMICK, JJ.

McCORMICK, Justice.

Plaintiff John Buckroyd appeals judgment entered for defendants after trial to the court of his medical malpractice action. The determinative question is whether the trial court erred in holding defendant Bunten's negligence could not be established without expert testimony. We affirm the trial court.

John was a minor when this action was commenced. He sued by his mother as next friend and she added her individual claim. When his mother died in 1972 John continued the action in his own right. He was 20 at the time of trial.

The chronology of events and essential facts are uncontroverted. John suffered a blow to his thigh while playing football during a game at Hoover High School in Des Moines on October 22, 1969, when he was 16. After some time on the sideline, he re-entered the game. For the next few days the thigh was swollen and painful, but he waited until October 27 to see a doctor about it.

On October 27, he saw defendant Ronald K. Bunten, a Des Moines orthopedic surgeon, in the emergency room at Iowa Methodist Hospital. John had seen Dr. Bunten in September regarding problems he was having with his knees. After taking his history and examining the thigh, including measuring the swelling and reading X-rays, Dr. Bunten concluded John had suffered a contusion of the thigh causing a hematoma, a collection of blood within the tissues. He prescribed medications and bedrest, with crutches to take the weight off the leg when walking.

John returned two days later with the same complaints. After examination, Dr. Bunten told John to continue to rest the leg and to see him in his office November 4. On that date, Dr. Bunten found less tenderness and swelling. He told John to continue to be cautious in use of the leg, and to continue use of crutches. He also told him to return November 14 for repeat X-rays of the thigh.

On November 13 John appeared at Broadlawns Hospital and reported he had been walking without crutches, had twisted his right knee, and experienced severe pain in the thigh. A telephone call was placed to defendant John H. Kelley, an orthopedic surgeon and partner of Dr. Bunten, relating to whether John should be hospitalized for observation. John was hospitalized at Broadlawns and seen there the next evening by Dr. Bunten. On this occasion Dr. Bunten aspirated the right knee, which had been troubling John since before his thigh injury, and applied an ace bandage to it. John was then transferred to Iowa Methodist Hospital where he remained until November 22. At Dr. Bunten's direction he was treated with bedrest, heat, whirlpool therapy, and elevation of the leg. Dr. Kelley may have visited John while he was hospitalized but did not examine or treat him.

After his discharge from the hospital on November 22, John next saw Dr. Bunten on November 24. He complained of intermittent cramping of the thigh muscle. Dr. Bunten recommended that he continue with his crutches, muscle relaxants, and pain medication. Dr. Bunten testified that the swelling had been reduced and was more localized. His diagnosis never changed. John and his mother were dissatisfied with Dr. Bunten and decided to change doctors.

On Thanksgiving Day, November 27, John went to the Mercy Hospital emergency room where he was seen by Dr. Marvin Dubansky, also an orthopedic surgeon. Dr. Dubansky took John's history and noted the swelling and tenderness of the thigh. He diagnosed the condition as chronic hematoma. He applied a walking cylinder cast to immobilize the leg and sent John home. John experienced great pain during the night and at Dr. Dubansky's direction was taken to Mercy Hospital where the cast was removed 12 hours after it had been put on. John again went home.

On December 2, John was brought to the emergency room of Northwest Hospital where he was seen by Dr. Sidney H. Robi-

now, a partner of Dr. Dubansky. The thigh was still swollen and painful. The swelling could not be reduced by aspiration. Dr. Dubansky operated on the thigh the next day and evacuated 400 cc's of clotted blood from the swollen area. Considerable bleeding occurred during surgery. John was given multiple transfusions of blood, 12 pints in all. The amount of bleeding led Dr. Dubansky to believe some cause other than the original trauma might be responsible. John was discharged from Northwest Hospital on December 15.

The thigh continued to be swollen and painful. On December 21 John went to Mercy Hospital where he was seen by Dr. Dubansky the next day. Dr. Dubansky diagnosed the condition as recurrent hematoma. He called in Dr. Alexander Matthews, a thoracic and vascular surgeon, for consultation. Dr. Matthews examined John and recommended an arteriogram which was done. The arteriogram showed an aneurysm at the level of the third branch of the profunda femoris artery, possibly caused by an abnormal direct communication called an arteriovenous fistula between the artery and a vein at that site. On December 26 Dr. Matthews surgically removed such an arteriovenous malformation and a large arterial aneurysm and repaired the affected blood vessels.

He testified an arteriovenous fistula could be caused by a penetrating injury but not a blunt injury like that suffered by John. He said the aneurysm was associated with the arteriovenous fistula which was probably congenital. He thought the malformation could have contributed to the bleeding in the thigh prior to the Dubansky surgery, and he said it did cause the excessive bleeding during and following that surgery.

Dr. Dubansky testified he had not seen a similar problem in 25 years of medical practice.

After the Matthews surgery, John experienced a complete recovery without disabili-

ty. The only defect was residual scarring in the fascia of the thigh.

■ At the conclusion of all the evidence, the trial court sustained a motion to dismiss the action as to Dr. Kelley. Although this ruling is not assigned as error, plaintiff does not distinguish between Dr. Kelley and Dr. Bunten with regard to the errors which are assigned. Even if those errors were established, they could not help plaintiff's claim against Dr. Kelley. As Dr. Kelley's sole material contact with the case was in taking a telephone call regarding John's admission to Broadlawns Hospital on November 13, and no charge of malpractice is predicated on that event, the trial court's ruling dismissing the claim against him was manifestly correct.

After submission of the case, the trial court held the action should have been dismissed as to Dr. Bunten at the conclusion of the evidence, but also found in Dr. Bunten's favor as trier of the facts.

■ Plaintiff offered no expert medical testimony to prove Dr. Bunten's negligence. His principal charge of negligence against Dr. Bunten was the doctor's alleged failure to exercise due care in diagnosis of his condition. A medical malpractice claim may be predicated on negligence in diagnosis. *Dickinson v. Mailliard*, 175 N.W.2d 588, 590 (Iowa 1970). Plaintiff argues this specification was established by circumstantial evidence. He points out that Dr. Bunten admitted the injury was serious but nevertheless failed to order a relatively low-risk arteriogram or refer the case to a vascular surgeon like Dr. Matthews. When Dr. Matthews did enter the case, he ordered an arteriogram which revealed the true condition, the arteriovenous fistula and aneurysm. In response to this argument the trial court held plaintiff was obliged in the facts of this case to present expert medical testimony to establish a standard of medical skill in diagnosis or treatment of his injury and breach of such standard proximately causing his damages. The court held, "The standard and its breach, if any, are not so

obvious in this case that they are within the contemplation of a layman such as a judge or jury."

In attacking this holding, plaintiff does not challenge the sufficiency of evidence to support the trial court's findings of fact in this law action tried to the court. Instead, he contends those findings were induced by an erroneous view of the law. He relies on the principle that we are not bound by findings of fact resulting from application of an erroneous rule of law. *Farmers Insurance Group v. Merryweather*, 214 N.W.2d 184, 186–187 (Iowa 1974).

The question presented is whether the trial court erred in holding plaintiff could not establish Dr. Bunten's negligence without expert medical testimony. Resolution of this question is decisive of the appeal because plaintiff's two other assignments of error involve evidentiary rulings which do not affect the fact he did not present any expert medical testimony to prove Dr. Bunten's negligence. The challenged evidentiary rulings relate to exclusion of alleged *res gestae* comments by Dr. Robinow during his examination of John at Northwest Hospital on December 2 and allowance of hypothetical questions directed by defense counsel to Doctors Dubansky and Matthews on cross-examination and Dr. Donald W. Blair, a defense witness, on direct examination. The excluded comments of Dr. Robinow would not constitute expert testimony of Dr. Bunten's negligence, and the hypothetical questions were part of an affirmative effort by the defense to establish Dr. Bunten's due care.

In challenging the trial court's holding that he could not prove Dr. Bunten's negligence without expert medical testimony showing the applicable standard of care and its breach, plaintiff contends this case comes within an exception to the rule that expert testimony is necessary.

■ We have recognized two exceptions to the rule. One is a situation where the physician's lack of care is so obvious as to

be within the comprehension of a layman and requires only common knowledge and experience to understand. The other exception is really an example of the first situation. It arises when the physician injures a part of the body not being treated. *Grosjean v. Spencer*, 258 Iowa 685, 692, 140 N.W.2d 139, 144 (1966); see *McCleeary v. Wirtz*, 222 N.W.2d 409 (Iowa 1974); *Wiles v. Myerly*, 210 N.W.2d 619 (Iowa 1973); *Perin v. Hayne*, 210 N.W.2d 609 (Iowa 1973); *Sinkey v. Surgical Associates*, 186 N.W.2d 658, 661 (Iowa 1971) ("The cases where we have indicated the exception might apply have all been cases where something drastic was wrong with the diagnosis or the treatment.").

■ The present case does not come within either exception. It is subject to the rule requiring expert testimony. No medical witness said Dr. Bunten's diagnosis did not conform with the applicable standard of care. In fact, Dr. Matthews testified that it was only when the excessive bleeding occurred following the December 3 Dubansky surgery that an arteriogram was indicated. He said he had never seen, read or heard of an arteriovenous fistula being caused by a non-penetrating injury of the kind John had. Dr. Dubansky said he had not observed such a condition in 25 years of medical practice. In these circumstances the condition which plaintiff contends Dr. Bunten was negligent in failing to diagnose was well beyond the common knowledge and experience of laymen.

This conclusion is reinforced by the fact that Doctors Robinow and Dubansky made the same diagnosis of plaintiff's injury as Dr. Bunten. Dr. Dubansky changed his mind only after his December 3 surgery.

Similarly, the standard of treatment for such an injury is beyond the common knowledge and experience of laymen. In fact, all physician witnesses who were asked explained that the usual treatment for a hematoma of the thigh caused by blunt trauma is the conservative program undertaken by Dr. Bunten, mainly involving rest and immobilization of the leg with a gradual resumption of activities. Normally, over a prolonged period, the clotting is absorbed into the system and the injured blood vessels heal. On direct examination by plaintiff's counsel, Dr. Matthews testified as follows:

"The usual course of therapy for such a condition and one that I would follow would be that of being very conservative. This consists of putting the extremity to rest, treating the extremity with forms of physical therapy naturally, local heat or whirlpool and then waiting. Occasionally after one has done this, if there develops a fluctuating area at the site of the injury, and by fluctuating I mean by palpation where you can feel there is free fluid therein, then you can do an incision and drainage after this develops to evacuate the hemalyzed blood; namely, the liquid portion of what blood and what tissue fluids have accumulated in the area. But I also prefer to treat such injuries conservatively consisting of rest, physical therapy and the patient waiting."

Under the record in this case a lay person unaided by expert medical testimony would have no basis to find that Dr. Bunten breached the applicable standard of care in treating plaintiff.

No medical evidence suggests Dr. Bunten should have anticipated during the time John was his patient that he had a congenital arteriovenous malformation which would ultimately require surgical correction. No medical evidence points to a duty by Dr. Bunten to use any diagnostic tool or method other than those he employed. No medical evidence shows his diagnosis was deficient or that the treatment he prescribed was inadequate based upon the nature of the trauma, the history, or any other information he had or should have had.

The trial court did not err in holding this to be a case where Dr. Bunten's negligence could not be established without expert medical testimony. Since no such testimo-

ny probative of Dr. Bunten's negligence was produced by plaintiff, the trial court would have been justified as a matter of law in denying plaintiff recovery from Dr. Bunten on this ground alone.

Affirmed.