**Howard L. VAUGHN, Appellee,**

v.

**AG PROCESSING, INC., Appellant.**

**No. 89–138.**

Supreme Court of Iowa.

July 18, 1990.

Rehearing Denied Sept. 19, 1990.

Diane M. Stahle, of Davis, Hockenberg, Wine, Brown, Koehn, & Shors, Des Moines, and A. Stevenson Bogue and Patrick J. Barrett of McGrath, North, Mullin & Kratz, P.C., Omaha, Neb., for appellant.

Claus H. Bunz of the Bunz Law Firm, Manning, and James Furey, Carroll, for appellee.

Nancy J. Gannon, Milwaukee, Wis., and Patrick H. Payton, Des Moines, for amicus curiae Catholic League for Religious and Civil Rights.

SCHULTZ, Justice.

In late December 1985, Plaintiff Howard Vaughn was employed by the defendant, Ag Processing, Inc. (Ag), at its soybean processing plant in Manning, Iowa. In June 1986 plaintiff walked off the job following an incident which culminated several months of an antagonistic relationship between him and his supervisor Alvin Mueller. Plaintiff obtained a right-to-sue letter from the Iowa Civil Rights Commission and filed a petition in district court advancing several theories of recovery. The claims of religious discrimination and intentional infliction of emotional distress survived a ruling on defendant's motion to dismiss. The court found for plaintiff on both counts and awarded a judgment for back pay, emotional distress damages, punitive damages and attorney fees. Defendant appealed, and plaintiff cross-appealed. We affirm in part, and reverse in part and remand.

Plaintiff, who was forty-eight years old at the time of trial in 1988, converted to Catholicism when he was in the Navy in 1964. He is a religious man who attends church regularly with his wife and minor son. He claims that his religious beliefs were ridiculed, starting in February 1986, when he began working in the maintenance department under the supervision of Mr. Mueller. It was generally acknowledged that Mueller was a "rough talker" and an ill-tempered man who frequently swore and called the workers derogatory names when he was dissatisfied with their work. The record is replete with examples of Mueller's abusive language and behavior. Despite this, however, Mueller had worked at

the soybean plant since it had opened and was recognized as a knowledgeable and competent worker.

In March while plaintiff was repairing an electrical system, he asked Mueller for some time off to go to church. Mueller initially refused but then allowed plaintiff to leave about four hours later. A day or so after this occurred, while plaintiff was rewiring some motors, Mueller called him a "goddamn stupid fuckin' Catholic" and referred to another employee as "[a]nother dumb Catholic." He then turned to plaintiff and said: "I know you're Catholic, but I haven't seen one yet that had any fuckin' brains." A couple of days later Mueller asked plaintiff, "Is that all you people do is have kids?" when discussing a Catholic coworker whose wife just had had a baby.

In late April, after attempting in vain to discuss his complaints with Mueller, plaintiff, pursuant to the personnel handbook, talked with his superior who spoke to the plant manager. The manager then reprimanded Mueller. Contrary to defendant's claim, this did not stop Mueller from making anti-Catholic remarks to plaintiff. In May Mueller referred to another employee in plaintiff's presence as a "pus-gutted Catholic." He made the following additional comments: "You people like fish, don't you?" and "I suppose you're going to raise [your son] Catholic." Plaintiff testified that "[e]verybody was subjected to [Mueller's] harassment and verbal abuse" on almost a daily basis.

Plaintiff again spoke with the plant manager who, in turn, spoke with Mueller on June 5 about his "use of abusive language when directing his subordinates." Mueller rejected the plant manager's offer of professional assistance to help him change his attitude and behavior towards his coworkers.

On June 14, 1986 plaintiff was wiring a new motor. While he was waiting for the power to be disconnected, Mueller told him that if he could not wire the motor, he should "get the hell out of here." Plaintiff walked off the job and called the plant manager, who told him that he would try and remedy the situation. When plaintiff reported to work the next day, there was a note on his timecard telling him to turn in his tools. Plaintiff thought he was fired.

On June 16 plaintiff met with the plant manager and Mueller. Mueller apologized to plaintiff who was then offered his job back. Despite assurances from the manager that Mueller's behavior would improve, plaintiff refused to return to Ag if he had to continue to work under Mueller. There were no other positions available. A few days later plaintiff was again asked whether he was willing to return to work. On June 25, following an investigation to determine whether "there was sufficient evidence to prove improper behavior," the plant manager gave Mueller a written deficiency letter and told him that any "reoccurrence of inappropriate behavior toward the personnel" would result in his discharge. The Ag corporate office in Omaha was notified of the problem and a copy of the deficiency letter placed in Mueller's file.

On June 27 plaintiff was informed that his job was still open and assured that Mueller's inappropriate behavior would not be tolerated. Plaintiff did not reply until August 5 when he was again told that his position was still open. Plaintiff refused to work with Mueller despite being told that Mueller's behavior had improved since he had left in June. The plant manager felt that he need not replace Mueller as long as his behavior was improving, and he had received no additional complaints.

Plaintiff's initial action was the filing of a claim for unemployment benefits on July 3. While he claimed harassment by his supervisor, these allegations were based on coarse and abusive language with no religious implications. On September 29 he filed the civil rights complaint that eventually formed the basis for this appeal. Following a trial to the court, judgment was entered against defendant for compensatory and punitive damages.

Defendant appeals, claiming that the court erred in (1) finding that Ag discriminated against plaintiff on the basis of his religion, (2) finding plaintiff was constructively discharged, (3) finding that Ag's of-

fers of reinstatement did not toll plaintiff's damages, (4) finding intentional infliction of emotional distress, (5) awarding excessive emotional distress damages, and (6) awarding punitive damages. Plaintiff's cross-appeal alleges that the trial court erred in striking his demand for a jury trial, in ruling that some of his causes of action were preempted by the Iowa Civil Rights Act, and in not awarding front pay. We first address defendant's claims.

■ I. *Religious harassment.* Defendant makes two preliminary points which we briefly address. First, it notes that plaintiff did not specifically plead this case as a "hostile environment case" but rather as an action based on religious discrimination. We believe that our liberal rules on notice pleading are broad enough to allow a claim of religious discrimination to encompass a cause of action based on religious harassment. *See* Iowa R.Civ.P. 69; *Adam v. Mt. Pleasant Bank & Trust Co.*, 355 N.W.2d 868, 870 (Iowa 1984) (petition need not identify specific legal theory). It is also apparent that this case was tried without objection from defendant as an action based on religious harassment. The theory under which a case was tried will be the theory upon which an appeal is based. *Shill v. Careage Corp.*, 353 N.W.2d 416, 420 (Iowa 1984).

■ Second, defendant points out that we have never recognized a cause of action based on religious harassment. We have, however, recognized that the Iowa Civil Rights Act protects employees from both racial and sexual harassment. *See Lynch v. City of Des Moines*, 454 N.W.2d 827 (Iowa 1990); *Chauffeurs, Teamsters and Helpers, Local Union No. 238 v. Iowa Civil Rights Comm'n*, 394 N.W.2d 375 (Iowa 1986). Section 601A.6(1)(a) prohibits discrimination in employment based on religion as well as on sex and race. We therefore find no reason why this protection should not similarly apply to victims of religious discrimination and now hold that a hostile work environment based on religious harassment is a form of religious discrimination prohibited by section 601A.6(1)(a) of the Iowa Civil Rights Act.

■ A hostile work environment is caused by discriminatory conduct or harassment which " 'has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment.' " *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49, 58–59 (1986) (quoting 29 C.F.R. § 1604.11(a)(3) (1985)). The trial court correctly set out the elements of a prima facie case of religious harassment. They are:

(1) the plaintiff belongs to a protected class;

(2) the plaintiff was subject to unwelcome religious harassment;

(3) the harassment was based upon religion;

(4) the harassment affected a term, condition or privilege of employment, and;

(5) the employer knew or should have known of the harassment and failed to take prompt remedial action.

*Cf. Lynch*, 454 N.W.2d at 833; *Chauffeurs*, 394 N.W.2d at 378. *Accord Hall v. Gus Constr. Co.*, 842 F.2d 1010, 1013 (8th Cir.1988); *Henson v. City of Dundee*, 682 F.2d 897, 903–05 (11th Cir.1982). *See also Weiss v. United States*, 595 F.Supp. 1050, 1057 (E.D.Va.1984) (in religious harassment case, plaintiff must establish employer had actual or constructive knowledge of harassment and took no prompt and remedial action).

■ A district court's finding of discrimination is a finding of fact. *Ways v. City of Lincoln*, 871 F.2d 750, 754 (8th Cir.1989); *Smith v. ADM Feed Corp.*, 456 N.W.2d 378 (Iowa 1990). We will reverse the finding of religious harassment only if we conclude that the finding is not supported by substantial evidence. *Lynch*, 454 N.W.2d at 829. However, we are not bound by the district court's application of the relevant legal principles or its conclusions of law. *In re Receivership of Mt. Pleasant Bank & Trust Co.*, 426 N.W.2d 126, 129 (Iowa 1988).

■ A. *Causal relationship.* Defendant does not contest that plaintiff, as the holder of a bona fide religious belief, is a member of a protected class. Nor does it suggest that the harassment, if any, was welcome. Defendant first attacks the third prong of the prima facie case, asserting that Mueller's alleged statements were not causally related to plaintiff's religious beliefs. To show that the harassment was due to his religion, plaintiff must prove that "but for" the fact of his religion, he would not have been the object of harassment. *See Henson,* 682 F.2d at 904; *Haehn v. City of Hoisington,* 702 F.Supp. 1526, 1529 (D.Kan.1988).

■ Defendant claims that all of Mueller's anti-Catholic remarks occurred "on a single afternoon in late March within a fifteen-minute period" and that any other offensive statements were examples of Mueller's harsh treatment of all his subordinates. A similar claim was made and rejected by this court in *Lynch,* 454 N.W.2d at 834. There the City claimed that the "harassment of Lynch was not based upon sex because [certain policemen] used obscene language all the time to everyone." *Id.* While we acknowledged that the verbal abuse may not have only been reserved for women, we found that many of the insulting comments aimed at Lynch were particularly reserved for women. *Id.* We then concluded that there was substantial evidence to justify the trial court's finding that Lynch was the victim of sexual harassment. *Id.*

The same is true in the case before us. Plaintiff testified that Mueller made specific anti-Catholic remarks in March and May and that he made abusive remarks on a daily basis. While it is clear from the record that Mueller used abusive language with all the workers, the court could have found that much of the offensive behavior was directed at plaintiff because he was Catholic. Despite its failure to address the issue in length, we find no error in the court's conclusion that plaintiff was the victim of religious discrimination.

B. *Hostile work environment.* Defendant claims that Mueller's behavior was legally insufficient to violate the Iowa Civil Rights Act in that the religious slurs did not create a persistent and pervasive hostile working environment. In *Lynch* we stated:

> Where sexual harassment in the workplace is so pervasive and severe that it creates a hostile or abusive work environment, so that the plaintiff must endure an unreasonably offensive environment or quit working, the sexual harassment affects a condition of employment.

454 N.W.2d at 834. The question here is whether the religious harassment was sufficiently severe and pervasive to alter the terms and conditions of plaintiff's employment, creating a hostile work environment in violation of the Civil Rights Act.

■ The existence of a hostile or abusive working environment must be established by the totality of the circumstances. *Vance v. Southern Bell Tel. & Tel. Co.,* 863 F.2d 1503, 1510 (11th Cir.1989); *Gilbert v. City of Little Rock,* 722 F.2d 1390, 1394 (8th Cir.1983); *Henson,* 682 F.2d at 904. Whether Mueller's use of religious slurs is continuous, severe and pervasive enough to rise to a violation of the Iowa Civil Rights Act is a question of fact. *See Gilbert,* 722 F.2d at 1394.

■ It is well established that the "mere utterance of an ethnic or racial epithet which engenders offensive feelings in an employee" does not affect the terms, conditions or privileges of employment to a significant degree. *Rogers v. EEOC,* 454 F.2d 234, 238 (5th Cir.1971), *cert. denied,* 406 U.S. 957, 92 S.Ct. 2058, 32 L.Ed.2d 343 (1972); *accord Ways,* 871 F.2d at 754; *Gilbert,* 722 F.2d at 1394; *Johnson v. Bunny Bread,* 646 F.2d 1250, 1257 (8th Cir.1981); *Cariddi v. Kansas City Chiefs Football Club, Inc.,* 568 F.2d 87, 88 (8th Cir.1977). Discriminatory comments that are "merely part of casual conversation, are accidental or are sporadic do not trigger ... sanctions." *Bunny Bread,* 646 F.2d at 1257.

■ On the other hand, the determination of whether defendant's conduct is sufficiently severe and pervasive to constitute religious harassment does not turn solely

on the number of incidents alleged by plaintiff. *See Vance,* 863 F.2d at 1510. The totality of the circumstances requires the factfinder to examine the severity, as well as the number, of incidents of harassment. *Id.* at 1511. In some situations the severity of the offensive conduct may lessen the need for sustained exposure. *Haehn,* 702 F.Supp. at 1529. "The prima facie showing in a hostile environment case is likely to consist of evidence of many or very few acts or statements by the defendant which, taken together, constitute harassment." *Vance,* 863 F.2d at 1510.

Defendant claims that three discriminatory remarks on a single day do not establish a hostile environment. Our review of the record reveals, however, that additional anti-Catholic remarks were made directly to plaintiff or in his presence. While we believe the question of whether Mueller's behavior was sufficiently severe and pervasive to alter a condition of plaintiff's employment is a close one, we need not decide that issue. We base our decision instead on a determination of Ag's liability.

■ C. *Employer's response.* Defendant claims that the court erred in concluding that it failed to take prompt remedial action against Mueller. Under the test adopted by our court in *Lynch,* an employer is liable for hostile-environment harassment only if it knew or should have known of the alleged harassment and failed to take prompt remedial action. *Lynch,* 454 N.W.2d at 835. Plaintiff does not claim that Mueller, as supervisor, was acting as Ag or that Ag was strictly liable for Mueller's actions. *See Steele v. Offshore Shipbuilding, Inc.,* 867 F.2d 1311, 1316 (11th Cir.1989).

Defendant does not contest that it knew of the harassment and only challenges the court's finding that defendant did not make an appropriate response. We therefore do not turn our decision on the question of whether Ag knew that Mueller's "inappropriate behavior" included making specific anti-Catholic statements.

■ An employer cannot stand by and permit an employee to be harassed by his coworkers. *DeGrace v. Rumsfeld,* 614 F.2d 796, 803 (1st Cir.1980).

It may not always be within the employer's power to guarantee an environment free from bigotry. He cannot change the personal beliefs of his employees; he can let it be known, however, that racial harassment will not be tolerated, and he can take all reasonable measures to enforce this policy.... But once an employer has in good faith taken those measures which are both feasible and reasonable under the circumstances to combat the offensive conduct we do not think he can be charged with discriminating....

*Id.* at 805; *accord Snell v. Suffolk County,* 782 F.2d 1094, 1104 (2d Cir.1986). This standard places a reasonable duty on an employer who is aware of discrimination in the workplace to take reasonable steps to remedy it. *Snell,* 782 F.2d at 1104. Whether the employer has taken such action is a question of fact. *Id.* Factors that the court should consider are the gravity of the harm, the nature of the work environment, and the resources available to the employer. *Id.* (citations omitted).

■ We believe that the trial court erred in finding that the defendant did not take prompt remedial action to rectify the alleged harassment. Despite his assertion to the contrary in his appellate brief, plaintiff conceded during trial that Mueller must have been reprimanded for his conduct after he first complained in April. It also appears that the management at defendant's plant did not require plaintiff to follow the procedure set out in the employee's handbook to handle grievances; they instead allowed him to bypass Mueller and complain directly to the assistant plant manager. In addition, the trial court found that two days after plaintiff walked off the job in June, the plant manager had a meeting with plaintiff and Mueller where Mueller apologized for his swearing and said, "He would try to do better in the future." Plaintiff was then offered his job back.

The plant manager conducted an investigation of Mueller's behavior among the maintenance workers and the company supervisors. He notified the company's vice-

president of human resources in Omaha of the situation and placed a written reprimand in Mueller's employee file. Mueller was also verbally reprimanded and told that if there were any reoccurrences of "inappropriate behavior," he would be discharged. The plant manager then continued to monitor Mueller's behavior. *Cf. College–Town, Div. of Interco, Inc. v. Massachusetts Comm'n Against Discrimination,* 400 Mass. 156, 508 N.E.2d 587, 594 (1987) (where employee never given an opportunity to confront her harasser, employer's failure to conduct a "fair or thorough investigation" of employee's allegation of harassment was found to be "deferential and inadequate"). Every time that plaintiff was offered his job back, he was reassured that the defendant would not tolerate any more "inappropriate behavior." It is uncontested that defendant offered to rehire plaintiff at least three times after the June incident.

In *Barrett v. Omaha Nat'l Bank,* 726 F.2d 424 (8th Cir.1984), the plaintiff made the similar claim that her employer took no action to ensure her working environment would be free from sexual harassment. The Eighth Circuit observed that the law did not require the employer to fire the offending managers and that notification of any further misconduct would result in their discharge was sufficient to protect the employer from liability. *Id.* at 427; *see also Steele,* 867 F.2d at 1316 (employer who reprimanded supervisor for sexual harassment not found liable).

■ Defendant's conduct is especially reasonable in light of the evidence suggesting that it did not know that plaintiff was the victim of religious harassment but rather thought he was the unfortunate recipient of general verbal abuse. None of plaintiff's coworkers testified that they were the victims of religious harassment or that they knew that plaintiff was being so harassed. The religious harassment was therefore not so pervasive that we can impute liability to the employer. Neither the assistant plant manager, the plant manager nor the corporate executive in Omaha testified that they knew that plaintiff was the victim of religious harassment. The plant workers were only aware that Mueller was a "rough talker."

The disciplinary letter placed in Mueller's file similarly makes no mention of any derogatory religious remarks. While one could question management's motives in denying knowledge, it is revealing to note that plaintiff's July 1986 application for unemployment benefits did not allege discrimination on the basis of religion but only complained of verbal abuse. The application, which was uncontested by defendant, made reference to specific abusive statements made by Mueller, none of which was religious in nature.

Even conceding that defendant knew plaintiff was the victim of religious discrimination, we do not believe that there is substantial evidence to support the trial court's conclusion that defendant failed to take prompt and remedial action to deal with that harassment. At trial plaintiff stated: "I would still be working there had he done what I thought needed to be done ... either reprimand him or get us both together and talk to us and an apology would have done a lot for me." The trial court found that all three of these steps had been taken by defendant.

As plaintiff failed to prove his prima facie case, we need not address defendant's arguments concerning the award of damages and the finding of constructive discharge arising from the violation of the Iowa Civil Rights Act. We reverse the awards of compensatory and punitive damages and attorney fees awarded based on that theory. We now turn to the claim of intentional infliction of emotional distress.

■ II. *Intentional infliction of emotional distress.* Defendant claims that there was insufficient evidence to support the court's award of emotional distress damages based on the tort of intentional infliction of emotional distress. Proof of this tort requires:

    (1) Outrageous conduct by the defendant;

(2) The defendant's intentional causing, or reckless disregard of the probability of causing emotional distress;

(3) Plaintiff suffered severe or extreme emotional distress; and

(4) Actual and proximate causation of the emotional distress by the defendant's outrageous conduct.

*Vinson v. Linn–Mar Community School Dist.,* 360 N.W.2d 108, 118 (Iowa 1984).

■ In order for conduct to be considered outrageous it must be " 'so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.' " *Harsha v. State Sav. Bank,* 346 N.W.2d 791, 801 (Iowa 1984) (quoting Restatement (Second) of Torts § 46 comment d (1965)); *accord Haldeman v. Total Petroleum, Inc.,* 376 N.W.2d 98, 104 (Iowa 1985); *Reihmann v. Foerstner,* 375 N.W.2d 677, 681 (Iowa 1985). We require substantial evidence of such extreme conduct. *Vinson,* 360 N.W.2d at 118.

■ We have recognized that an employer has a duty to refrain from abusive behavior toward its employees. *Id.* (citing *Hall v. May Dep't Stores Co.,* 292 Or. 131, 138, 637 P.2d 126, 131 (1981); *see* Restatement (Second) of Torts § 46 comment e (1965)). When evaluating claims of outrageous conduct arising out of employer-employee relationships, we have required a reasonable level of tolerance. *Northrup v. Farmland Inds., Inc.,* 372 N.W.2d 193, 199 (Iowa 1985). Every unkind and inconsiderate act cannot be compensable. *Id.* at 198–99.

■ We need not decide whether Mueller's conduct was sufficiently outrageous to be actionable or whether Ag was responsible. We believe that the lack of evidence of severe emotional distress caused by defendant's conduct is dispositive in this case. When asked at trial what impact the anti-Catholic statements had had on him, plaintiff replied, "I've never really thought about it." When asked whether he had experienced any emotional problems while working at defendant's

plant, he testified that he had been "upset," "grouchy" and "nervous" and that his sex life had deteriorated. We have held that similar complaints were not sufficient to warrant a finding of severe emotional distress. *See Harsha,* 346 N.W.2d at 801; *Poulsen v. Russell,* 300 N.W.2d 289, 297 (Iowa 1981); *accord Polito v. Perkins Restaurants, Inc.,* 617 F.Supp. 380, 383–84 (N.D.Iowa 1985); *Hubbard v. United Press Int'l, Inc.,* 330 N.W.2d 428, 440 (Minn. 1983). Plaintiff must prove more than the fact that he felt bad for a period of time. *Randa v. U.S. Homes, Inc.,* 325 N.W.2d 905, 908 (Iowa App.1982).

■ Plaintiff also put on proof of physical ailments that plagued him from approximately May 1986 to January 1987. However, any medical evidence of the cause of these ailments is noticeably missing from the record. Questions of causation which are beyond the understanding of a layperson require expert testimony. *Donovan v. State,* 445 N.W.2d 763, 766 (Iowa 1989); *see Oswald v. LeGrand,* 453 N.W.2d 634 (Iowa 1990). The test for determining when an expert should be used is whether the untrained layperson " 'would be qualified to determine intelligently ... the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute.' " *M–Z Enters. v. Hawkeye–Security Ins. Co.,* 318 N.W.2d 408, 414 (Iowa 1982) (quoting Ladd, *Expert Testimony,* 5 Vand.L.Rev. 414, 418 (1952)).

In *Donovan* the plaintiff alleged that a break in sterile procedure caused a staph infection. 445 N.W.2d at 767. This court found that his failure to designate an expert pursuant to Iowa Code section 668.11 (1987) was fatal to his case. *Id.* Without an expert plaintiff could not dispute the State's claim that his care and treatment were within the accepted standards of medical practice. *Id.* In *Oswald,* plaintiffs, who also failed to designate an expert to testify whether their fetus' lost chance of survival was caused by the physician's negligence, suffered a similar fate. 453 N.W.2d at 638.

We have recognized two exceptions to the rule requiring expert testimony. *Id.* (quoting *Buckroyd v. Bunten,* 237 N.W.2d 808, 811–12 (Iowa 1976)). One occurs when the causation is so obvious as to be within the common knowledge and experience of the layperson; the other arises when the physician injures a part of the body not being treated. *Id.* Neither of these exceptions are applicable in the present case.

The primary evidence of plaintiff's harm was his own testimony and conclusions that he had lost fifty pounds and become ill with colitis, having as many as twenty bloody stools a day, all because of the harassment he had suffered at work. While it is not clear from the record when plaintiff saw his physician, the physician did not testify at trial. The plaintiff simply does not have the medical expertise to explain the relationship of his work environment to physical symptoms which peaked three months after he left his employment. Nor does he have the expertise to explain why he started feeling better in 1987, six months after he left defendant's plant, when he stopped taking tranquilizers. The causal relationship between Mueller's conduct and plaintiff's symptoms is not within the common experience of a jury. *Cf. Oswald,* 453 N.W.2d at 639 (defendant's departure from hospital leaving hysterical plaintiff unattended in corridor about to give birth and lack of professional courtesy regarding patient care and treatment was "so obvious as to be within the common knowledge of laypersons without the aid of expert testimony").

In many cases where we have held that a fact question was engendered on the issue of emotional harm and causation, we have relied on the testimony of physicians and psychiatrists. *See, e.g., Hy–Vee Food Stores, Inc. v. Iowa Civil Rights Comm'n,* 453 N.W.2d 512 (Iowa 1990); *Hall v. Montgomery Ward & Co.,* 252 N.W.2d 421, 422 (Iowa 1977); *Meyer v. Nottger,* 241 N.W.2d 911, 916 (Iowa 1976); *Blong v. Snyder,* 361 N.W.2d 312, 315 (Iowa App.1984); *cf. Harsha,* 346 N.W.2d at 801; *Poulsen,* 300 N.W.2d at 297. We believe that in this case such testimony was crucial.

We therefore conclude that there was insufficient evidence to support the trial court's award of emotional distress damages under this cause of action. This basis of liability should have been dismissed.

A. *Jury trial.* While we agree that plaintiff was not entitled to a jury trial under the civil rights action (*see Smith,* 456 N.W.2d at 382), he was entitled to a jury trial on his claim of outrageous conduct. In a pretrial ruling the district court[1] struck the demand for a jury trial. The motion to strike was directed, however, at the civil rights claim. The parties apparently believed this ruling also applied to the remaining claim before the court. By not objecting when the case was scheduled for a bench trial plaintiff failed to preserve error on this issue. *See White v. McGinnis,* 903 F.2d 699 (9th Cir.1990). After reviewing all the evidence in the record before us in a light most favorable to plaintiff and for the reasons discussed above, we believe that had the claim of outrageous conduct been tried to a jury, there would have been insufficient evidence to submit that claim. *See Poulsen,* 300 N.W.2d at 296.

III. *Dismissal of claims.* Plaintiff's initial petition included seven counts based on chapter 601A and "other state law claims arising out of defendant's actions in terminating plaintiff." Defendant's motion to dismiss counts II, III, IV, VI and VII was granted by the district court which held that those claims were preempted by the Iowa Civil Rights Act. We first address the claim made in division IV of plaintiff's petition which alleges a cause of action based on wrongful discharge in violation of public policy.

A. *Wrongful discharge.* In *Springer v. Weeks & Leo Co.,* 429 N.W.2d 558, 559 (Iowa 1988), this court recognized an at-will employee's right to compensation for wrongful discharge in violation of a

---

1. Judge Richardson ruled on this motion. All other rulings, including those made during trial, were made by Judge Hellwege.

"clearly articulated public policy of this state." Plaintiff claims that defendant's harassment which resulted in his termination violates the State's policy against religious discrimination set out in Iowa Code sections 708.1, 729.1 and 729.4(1) (1985).

Section 708.1 does not speak to discrimination but defines assault; it refers to acts which are intended to result in physical conduct, place another in fear of immediate physical contact or threaten someone by displaying any dangerous weapon. § 708.1(1), (2), (3). Emotional pain and suffering without any accompanying fear of physical injury are clearly not encompassed within this definition. *See* Blacks Law Dictionary 105 (5th ed. 1979).

Section 729.4(1) makes it a simple misdemeanor for an employer to discriminate on the basis of religion. It is a serious misdemeanor to violate article I, section 4 of the Iowa Constitution which prohibits religious discrimination. § 729.1

In *Northrup*, plaintiff made the similar claim that his discharge for alcoholism was a violation of public policy. 372 N.W.2d at 196. We noted that a person discharged because of alcoholism could pursue a remedy under chapter 601A. *Id.* This was not the case in *Springer* where the plaintiff was discharged for filing a workers' compensation claim and not for any discriminatory reason prohibited by chapter 601A. To determine whether the chapter 601A remedy was an exclusive or alternative remedy, we looked to section 601A.16(1) which provides that "[a] person claiming to be aggrieved by an unfair or discriminatory practice must initially seek an administrative release" and concluded that a claimant asserting a discriminatory practice must pursue the remedy provided by the act. *Northrup*, 372 N.W.2d at 197.

We have said that the Iowa Civil Rights Act was "designed to correct a broad pattern of behavior." *Estabrook v. Iowa Civil Rights Comm'n*, 283 N.W.2d 306, 308 (Iowa 1979). We believe that plaintiff is entitled to only those remedies provided by chapter 601A and that his cause of action based upon a violation of the criminal stat-

utes is preempted by that chapter. *Cf. Diem v. City and County of San Francisco*, 686 F.Supp. 806, 811 (N.D.Cal.1988) (plaintiff alleging religious harassment in employment allowed to bring separate action for violation of California Civil Code which specifically provided an independent basis of recovery apart from the Fair Employment and Housing Act).

Plaintiff makes the additional claim that he can bring an action for wrongful discharge based on the violation of the criminal statutes under Iowa Code section 611.-21 (1985). We have held that section 611.-21 provided a civil cause of action for the violation of a criminal statute which contained no provision for civil relief. *Hall*, 252 N.W.2d at 424. We believe, however, that the same reasoning applies to this claim as well as to the divisions of plaintiff's petition which allege unfair employment practices (division II) and termination in bad faith and with actual malice (division III) based upon violations of chapter 601A. Plaintiff can pursue a remedy for these causes of action under that chapter. *See Northrup*, 372 N.W.2d at 196. We conclude that the chapter 601A remedy is exclusive.

B. *Negligent harassment.* Plaintiff makes an additional claim (division VII) based upon the theory of "negligent harassment." He cites no authority in support of this cause of action. Failure to cite authority in support of an argument may be deemed a waiver of that issue. Iowa R.App.P. 14(a)(3); *Ellwood v. Mid States Commodities, Inc.*, 404 N.W.2d 174, 178 (Iowa 1987).

C. *Breach of employment contract.* In division VI of his petition, plaintiff pled a cause of action based on a breach of his employment contract. He claims that defendant's failure to follow the policies and procedures set forth in the employee handbook constituted a breach of its duty as an employer.

We have recognized that written personnel policies providing terms and procedures to be followed when discharging an employee could be considered part of an at-will employee's employment contract.

*Cannon v. National By–Products, Inc.,* 422 N.W.2d 638, 640 (Iowa 1988). We stated that even if the defendant had not intended for these policies to confer contractual rights, a contract could be found to exist "if this was the plaintiff's understanding and defendant had reason to suppose that plaintiff understood it in that light." *Id.* We held that the question of how these policies were perceived was an issue to be determined by the trier-of-fact. *Id.*

■ Plaintiff could not pursue a remedy for this alleged wrong under chapter 601A. It is a separate and independent cause of action triable to a jury. *See id.* A motion to dismiss on the pleadings should only be sustained where there is no conceivable state of facts under which plaintiff might demonstrate a right to relief. *Rittscher v. State,* 352 N.W.2d 247, 250 (Iowa 1984). If there is no genuine issue of material fact, summary judgment may be appropriate. *See* Iowa R.Civ.P. 237(c). Otherwise, the matter is for trial. We therefore reverse the trial court's dismissal of this cause of action and remand for further proceedings.

IV. *Disposition.* In conclusion, we reverse the trial court's finding that defendant was liable for the religious harassment suffered by plaintiff and for the damages, including attorney fees, arising from that judgment. We believe that there was insufficient evidence to raise a jury question on the issue of intentional infliction of emotional distress had the issue been properly tried to a jury. Upon remand the judgments entered shall be set aside. The trial court did not err in dismissing plaintiff's claims of wrongful discharge, unfair employment practices and termination in bad faith and actual malice as preempted by the Iowa Civil Rights Act. The cause of action based on an alleged breach of an employment contract was incorrectly dismissed, and this issue is remanded for further proceedings.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

All Justices concur except HARRIS, J., who dissents and is joined by LAVORATO and NEUMAN, JJ.

HARRIS, Justice (dissenting in part).

I respectfully dissent from divisions I C. and II because I believe there is sufficient evidence to support the trial court findings.

There is no dispute that Mueller, acting as the company supervisor in directing Vaughn's work, acted in a callously outrageous manner and that the company management was aware of it. The company concedes the point, contending only that (1) it was not aware that religious discrimination was included in the cruel epithets to which Vaughn was subjected; and (2) it took reasonable steps to remedy the situation. The issue was joined on both these two points and the trial court, acting as fact finder, resolved both points in favor of Vaughn and against the company.

On a de novo review we might resolve both of these factual issues in favor of the company. But our review is on error, and we are hence bound to affirm if the trial court findings are supported by substantial evidence in the record.

In sorting out whether substantial evidence exists it makes no difference whether our findings would be the same or that there is conflicting evidence on the point. It is for the finder of fact to determine the credibility of witnesses, weigh the evidence, and to decide what evidence to accept or reject. We view the record in the light most favorable to the finding. In stating these most elementary principles I do not suggest the majority in any way disagrees with them. They are so well settled they scarcely call for citation of authority. *See, e.g., Northrup v. Foster,* 204 N.W.2d 889, 890 (Iowa 1973).

When outrageous discrimination occurs at the workplace we should not, I readily agree, automatically blame the employer for it. On the other hand we should be alert for the fact that employers who do less than the law demands, who turn a managerial eye the other way, will routinely claim to have been militant in attempting to stamp out discrimination. It is much

more difficult to escape by such a ruse when the discrimination is inflicted, not by just another coworker, but by a supervisor whom the employer has placed in charge of the victim of discrimination. In determining whether prompt and reasonable steps were taken the trial court, as fact finder, was obliged to consider that Mueller, as Vaughn's *supervisor*, was the agent of defendant employer. Agency principles are relevant. *Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 72, 106 S.Ct. 2399, 2408, 91 L.Ed.2d 49, 63 (1986).

## I. *Religious Discrimination.*

As mentioned, the majority does not seem to doubt that the discrimination occurred. Rather it holds there was not substantial evidence to support the trial court finding that management was aware that religious discrimination was included in Mueller's outrageous conduct. I part from this view on two grounds. First, the holding overlooks the fact that the discrimination was inflicted by management's own representative, Vaughn's supervisor, who was a former assistant plant manager. My second ground of disagreeing on the point is based on actual testimony which the trial court obviously found to be true.

Mueller had in fact once been assistant plant manager and later became supervisor of the maintenance department where Vaughn worked. At that time another maintenance worker, Pat McKeighan, who was familiar with Mueller's proclivities, became plant superintendent. There was ample evidence to show that McKeighan took this knowledge with him when he was promoted. In fact Vaughn testified without objection as follows:

> And it was a constant thing, and they knew it. The company, I'll say I know Pat McKeighan knew it because I had told him and I know that he informed Tom Ray of everything that I have said at least up until I told him.

Religious discrimination occurred prior to Vaughn's conversation with McKeighan. McKeighan as plant superintendent knew of the discrimination. There is direct testimony that Ray also knew of it.

## II. *Employer's Response.*

This employer's justification for the discrimination was a self-condemning one: the chosen supervisor was simply "not a people person." The point seems to be that Mueller did not confine his outrageous conduct to Vaughn, that he was inclined to treat everyone outrageously. The point also carries an innuendo of knowledge by the employer. Tom Ray, the plant manager, responded to Vaughn's early complaints by saying "he would take care of it," that the company would send Mueller to a school "where he can learn to talk to people." It is most significant that this was not done.

Although Vaughn complained of Mueller's treatment several times, the majority seems to conclude he should have done even more to inform management. Other factors, however, support the trial court's finding. In the first place Vaughn's position as subordinate of Mueller placed him in a "Catch 22" situation. The plant superintendent warned him not to be complaining to management about Mueller, stating "If you ever go behind Al's [Mueller's] back, you'll be in a hell of a lot of trouble."

The trial court findings on Mueller's conduct and the company's awareness were quite specific. The trial court held:

> Sometime prior to the time that Mueller's harassment of plaintiff was accentuated by virtue of his reference to his religion, [Vaughn] had talked to Tom Ray and Ray assured him that "he would take care of it." Ray at that time admitted that Mueller was not a "people person" and that they were going to send him to a school "where he can learn to talk to people." This was not done. Plaintiff talked to Tom Ray on at least two occasions prior to June 14 concerning the treatment he had received from Mueller. On these occasions as well as on the occasion subsequent to June 14 when Mueller met plaintiff in Ray's office, Tom Ray took notes on the meetings. These notes have never been produced. It was defendant's policy to have plant managers report to the Omaha office whenever a labor relations incident arose. Yet the Omaha office failed to

disclose any correspondence from Tom Ray involving Mueller's conduct prior to May 30, 1986.

Many of the instances set out occurred out of the hearing of other employees. All of the instances with reference to religion were out of the hearing of other employees. This type of approach is the most insidious of harassment, particularly when inflicted by a supervisor upon an employee.

The trial court at another point held: [D]efendant employer is liable for the imposition of punitive damages by virtue of the fact that Mueller was employed in a managerial capacity in charge of the maintenance department. But, in any event, even though it could be contended that he was not acting in such capacity, the managerial agents, namely McKeighan and Tom Ray, both knew of the outrageous conduct imposed by Mueller upon the plaintiff and by standing placidly by ratified or approved the same.

This finding was supported by substantial evidence. For example Vaughn himself testified:

Q. And Pat McKeighan was the next person in chain of command? A. Yes.

Q. You say nobody ever apologized. Did Mr. Ray ever tell you, "we're sorry," or "we'll try to work this out with you," or make amends? A. No. He just told me to go out and shake hands with him and that was it. "I wish you'd forget it," he said.

Q. Did Mr. Mueller ever apologize to you? A. No.

Q. Did anybody on behalf of the company ever write a letter or anything indicating remorse or regrets that these incidents happened? A. No.

Vaughn testified that, rather than remedy the conduct, management told Mueller and Vaughn to "shake hands and forget it."

This is far from an adequate employer's response to outrageous conduct. Under the civil rights Act, Vaughn should not have to forget it. Once outrageous discriminatory conduct has been established an employer is required to do even more than disavow or apologize for it. Escape from liability at such a stage can only result from prompt and reasonable steps to remedy the discriminating working environment. Unless we are to undertake a de novo review, and reject testimony accepted by the trial court, we are bound to conclude that substantial evidence supports the trial court finding that the employer here did not take those reasonable steps.

When, as here, an experienced trial court finds the employer did not act with reasonable dispatch to stamp out outrageous discrimination we should be especially alert to apply the proper scope of review. The temptation is great, when reaching the crucial issue of employer's response, to slip toward a de novo review. We should undertake a de novo review in this case only to the extent we are willing to do so in all discrimination cases.

### III. *Emotional Distress.*

Substantial evidence also supports the trial court's finding that Vaughn was severely distressed by the outrageous conduct. Indeed I find the evidence supporting this finding to be unusually strong. Vaughn was shown to be inordinately sensitive about his religious faith and strongly committed to it. The evidence indicates the religious harassment was devastating to him, and that he suffered serious physical problems as a result.

The majority reviews this evidence, I respectfully suggest, on a de novo basis and disagrees with it. Apparently in the belief Vaughn was impeached by it, the majority places great weight on Vaughn's answer to one question. It concerned his reaction to Mueller's anti-Catholic statement: "I never really thought about it."

We instruct jurors in their fact-finding duties not to disregard the testimony of an impeached witness if they otherwise believe the witness's testimony to be true. The trial court here was entitled to do the same.

Because of its holdings the majority did not reach questions which I also do not address. It is enough here to state my

disagreement with the majority opinion in the two matters previously discussed.

LAVORATO and NEUMAN, JJ., join this dissent.