Marcus David WEEMS, Plaintiff,

v.

FEDERATED MUTUAL INSURANCE COMPANY, A/K/A Federated Life Insurance Company, A/K/A Federated Insurance Company, Jeff Daley, and Del Hirsch, Defendants.

No. C00–2013 MJM.

United States District Court,
N.D. Iowa,
Eastern Division.

March 20, 2002.

Thomas P. Frerichs, Frerichs law Office, PC, Waterloo, IA, Robert A. Wright, Jr., Wright & Wright, Des Moines, IA, for plaintiff.

Timothy C. Boller, Gallagher, Langlas & Gallagher, PC, Waterloo, IA, Gregory J. Stenmoe, Tamika R. Nordstrom, pro hac vice, Briggs Morgan PA, Minneapolis, MN, Matthew L. Preston, Brady & O'Shea PC, Cedar Rapids, IA, for defendants.

## OPINION and ORDER

MICHAEL J. MELLOY, Circuit Judge, sitting by designation.

In this lawsuit, Plaintiff Marcus David Weems asserts federal and state civil rights claims against the above-named corporate defendant[1] stemming from alleged racial discrimination during the course of his employment. (Doc. no. 1: Counts I and II). Mr. Weems also asserts state-based tort claims for assault and intentional infliction of emotional distress against Federated and two of its employees. (Doc. no. 1: Counts III and IV).

Presently before the Court is Defendants' motion for summary judgment by which they seek judgment in their favor on all claims based on the following grounds: (1) Plaintiff's discrimination claim brought pursuant to the Iowa Civil Rights Act is barred because he failed to file a civil lawsuit within the statutorily prescribed period; (2) Plaintiff's discriminatory discharge claim is barred because he failed to

---

1. The named corporate defendant, Federated Mutual Insurance Company, a/k/a Federated Life Insurance Company, a/k/a Federated Insurance Company, will be hereinafter referred to as "Federated." The individual defendants generally will be referred to by name. Where applicable, all named defendants will be referred to, collectively, as "Defendants."

exhaust administrative remedies; (3) Plaintiff's claims are barred for failure to follow procedural and jurisdictional requirements; (4) Plaintiff's emotional distress claim is preempted and fails as a matter of law; and (5) Plaintiff's assault claim fails as a matter of law.[2] In response, Mr. Weems concedes that his claims under the Iowa Civil Rights Act were untimely and does not resist Defendants' motion with regard to that count. (Doc. nos. 45 and 46). Plaintiff contests the remainder of Defendants' motion.

## I.

The standard for granting summary judgment is well-established. A motion for summary judgment may be granted only if, after examining all of the evidence in the light most favorable to the nonmoving party, the Court finds that no genuine issues of material fact exist and that the moving party is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Montgomery v. John Deere & Co.*, 169 F.3d 556, 559 (8th Cir. 1999). A fact is material if it might affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue of material fact is genuine "if it has a real basis in the record." *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir.1992) (citing *Matsushita*, 475 U.S. at 586–87, 106 S.Ct. 1348).

The party moving for summary judgment bears the "initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show lack of genuine issue." *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548. Once the moving party has carried its burden, the opponent must go beyond the pleadings and designate specific facts-by such methods as affidavits, depositions, answers to interrogatories, and admissions on file-that show there is a genuine issue for trial. *See* Fed.R.Civ.P. 56(e); *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548. The evidence of the nonmoving party is to be considered as true, and justifiable inferences arising from the evidence are to be drawn in his or her favor. *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505. However, if the evidence of the nonmoving party is "merely colorable," or is "not significantly probative," summary judgment may be granted. *Id.* at 249–50, 106 S.Ct. 2505. Thus, although the nonmoving party does not have to provide direct proof that genuine issues of fact exist for trial, the facts and circumstances that the nonmoving party relies upon must "attain the dignity of substantial evidence and must not be such as merely to create a suspicion." *Metge v. Baehler*, 762 F.2d 621, 625 (8th Cir.1985). In essence, the evidence must be "such that a reasonable jury could find a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

## II.[3]

Marcus David Weems is a 41–year–old African American male, born and raised in Waterloo, Iowa. Mr. Weems graduated from high school in 1978 and since then

---

**2.** Defendants have also filed a motion to strike Plaintiff's resistance to the motion for summary judgment on grounds that it does not comport with local procedural and formatting rules. (Doc. no. 49). That motion is denied.

**3.** The facts, as set forth below, are either uncontested or presented in the light most favorable to Mr. Weems, the nonmovant. Additional facts will be discussed in conjunction with each of Mr. Weems' claims.

has worked in a variety of insurance and sales-related jobs. He was a sales representative for AllState Insurance Company in Waterloo from September 1986 to June 1992. He then held the position of President and CEO of another Waterloo insurance agency until it was sold in July 1996. Mr. Weems then did consulting work, essentially as a sole proprietor-individual contractor, until his employment with Federated.

In February 1998, Mr. Weems applied for a Marketing Representative position with Federated, an insurance company offering property, health and life insurance primarily to small to medium-sized business owners throughout the United States. Following several interviews with Jeff Daley, the district manager, and a final interview also attended by Del Hirsch, the regional manager, Mr. Weems was offered the position. During one interview, Mr. Weems was told that only two African–Americans had ever worked at Federated in the history of the company. Mr. Weems concedes, however, that no other race-based comments were made and that neither Mr. Daley nor Mr. Hirsch said or did anything during the interview process that would suggest racial bias against him. Both Mr. Daley and Mr. Hirsch wrote recommendations supporting Mr. Weems' candidacy for the Waterloo/Cedar Falls area. Mr. Weems officially began his employment with Federated on June 1, 1998.

Mr. Weems' training at Federated involved classroom work as well as customized one-on-one training with his direct supervisor, Mr. Daley. The latter involved "homework assignments" and ride-alongs whereby Mr. Daley was to help Mr. Weems become familiar with Federated products and procedures, establish a home office and, most importantly, begin to develop a client base in the field. As documented by the record, there were perceived problems with Mr. Weems' work quality and progress from the start—particularly his failure to meet purportedly standardized and agreed-upon "minimal requirements" for sales calls, insurance requests, closed deals, etc. Federated also contends that Mr. Weems consistently failed to complete and/or turn in the daily, weekly and monthly logs considered vital for tracking sales prospects and volume, and that Mr. Weems often failed to return calls and messages from his supervisors. Throughout his employ, Mr. Weems met with Mr. Daley (and on occasion Mr. Hirsch) at fairly regular intervals to discuss his progress and ways that he could improve his performance with Federated. At many of these meetings, Mr. Weems was presented with memos and/or agreements setting out in detail perceived deficiencies and establishing goals for improvement. Mr. Weems was also repeatedly informed that a failure to meet these goals could result in termination.

According to Mr. Weems, his relationship with Mr. Daley, his direct supervisor, was strained from early on.[4] After about six weeks with Federated, the two were involved in a confrontation which allegedly deteriorated into an assault by Mr. Daley. At a follow-up meeting the next day with Mr. Daley and Mr. Hirsch, Mr. Weems was allegedly "forced" to partially disrobe to prove that he was not recording the meeting and his allegations against Mr. Daley were purportedly rejected in toto by Mr. Hirsch. It is from this point on that Mr. Weems contends the pervasive racial discrimination occurred, mainly through Mr. Daley's consistent use of racially de-

4. Again, details as to each of the incidents referenced herein are discussed at greater length in the Court's subsequent analysis.

rogatory comments directed at and about Mr. Weems.

In March 1999, Mr. Daley and Mr. Hirsch met with Mr. Weems and informed him again that he was not meeting Federated minimal standards and officially assigned him to a "performance enhancement program." This program set specific minimal goals as to the number of sales calls made, insurance quotes requested, and insurance policies sold which, if not met, would be grounds for immediate termination. Mr. Weems met the program goals for April 1999 and was given new "mandatory minimums" for May.

From May forward, several potentially relevant incidents occurred:

- On May 21, 1999, Mr. Weems filed a complaint with the Iowa Civil Rights Commission (ICRC) alleging, inter alia, race discrimination and retaliation by, primarily, Mr. Daley and Mr. Hirsch.

- On May 26, Mr. Weems was sent a State jury duty notice for service starting on June 8, 1999.

- On May 28, Federated sent Mr. Weems a letter congratulating him for his "successful completion of the performance enhancement objectives that ran from May 1, 1999 through May 31, 1999" and again setting new goals for June.[5]

- On June 2, the ICRC sent Federated notice of Mr. Weems' complaint.[6]

- On June 3, Mr. Daley faxed a letter to the Black Hawk County Clerk of Court requesting that Mr. Weems' jury service be rescheduled because of "an important meeting that he is required to attend on June 8th." That same day, the Clerk honored Mr. Daley's request, and Mr. Weems was notified that his jury service was "deferred until the term beginning August 17, 1999." On receipt of this notice, Mr. Weems apparently called the Clerk's office and informed them that, contrary to Mr. Daley's letter, he would be available for jury duty on June 8th as he could attend an alternative Federated training seminar on another date. Accordingly, the Clerk put Mr. Weems back on service for June 8, 1999.

- On June 4, Mr. Weems informed Mr. Daley by letter that he would attend the Federated training program on Monday, June 7th but would serve on jury duty as of June 8th because "the release from jury duty that you requested for me without my consent or knowledge has been rescinded." In the same letter, Mr. Weems provided earlier-requested information about a worker's compensation injury, informing Mr. Daley that "[i]t relates to the time you assaulted me and injured my arm in my Federated Office without provocation or justification."

- On June 7, Mr. Daley sent Mr. Weems an email and voicemail informing him that he was "suspended (with pay) pending review of the decision made last week to terminate [his] employment."

- On June 11, Mr. Daley sent Mr. Hirsch a four-page memo (and 100 + pages of purportedly supporting documentation) which states, in part, "[o]n the morning of June 4th, 1999, I called John Hanson in the legal department

---

5. Federated now contends, however, that the letter was sent based only on Mr. Weems' word that he had completed the minimum requirements and that in early June Federated learned that several benchmarks had not been met.

6. The precise date of Federated's receipt of the ICRC notice is not documented in the record.

to discuss my decision to terminate Marcus Weems. . . . John suggested that I set forth in writing the basic reasons for my decision so that you could review them upon your return from your recent vacation." The memo purportedly documents, *inter alia*, Mr. Weems' alleged failure to meet the May performance objectives, "issues in performance, truthfulness and follow up" which led to Mr. Weems being placed on a performance enhancement program, and "information and evidence [received] after . . . the decision to terminate . . . [that] supports [Mr. Daley's] decision to terminate [Mr. Weems]." The memo closes with the following postscript: "Please note: Even though an EEOC complaint was filed after I made my decision to terminate Marcus I still believe that this is a sound decision."

- On August 25, 1999, Mr. Weems filed suit against Federated in the Iowa District Court for Black Hawk County alleging that he was terminated in violation of state law because of his decision to attend jury duty.

- On November 9, 1999, Mr. Weems received a Right to Sue Letter from the ICRC based on his May 1999 complaint. On December 1, 1999, he received a Right to Sue notice from the EEOC. Mr. Weems filed his federal suit in this Court on February 8, 2000.

- On June 13, 2000, the state action was dismissed with prejudice based on the stipulated agreement of the parties.

## III.

Defendants assert entitlement to summary judgment on all claims. As noted above, Plaintiff has not resisted Defendants' challenge as to Count II, the discrimination claim brought under the Iowa Civil Rights Act and, accordingly, Defendants' motion will be granted with regard

to that claim. Plaintiff has resisted Defendants' motion as to the Title VII claim and the state-tort claims for intentional infliction of emotional distress and assault.

### Title VII

■ Defendants first argue that Mr. Weems' failure to amend his administrative complaint following his termination in June 1999 precludes him from alleging discriminatory discharge under Title VII. Title VII includes an exhaustion of remedies requirement under which, prior to bringing federal suit, the plaintiff must: (1) timely file a charge of discrimination with the EEOC setting forth the facts and nature of the charge and (2) receive notice of the right to sue. 42 U.S.C. § 2000e–5(b), (c), (e); *Williams v. Little Rock Mun. Water Works*, 21 F.3d 218, 222 (8th Cir. 1994) (discussing centrality of exhaustion of remedies requirement under Title VII "because it provides the EEOC the first opportunity to investigate discriminatory practices and enables it to perform its roles of obtaining voluntary compliance and promoting conciliatory efforts"). Mr. Weems filed his complaint with the Iowa Civil Rights Commission (ICRC) on May 21, 1999, (which cross-filed the complaint with the EEOC). His complaint charges racial discrimination and retaliation, and documents the "last date that something discriminatory happened" as March 1999, when higher production standards were purportedly set for him. Notice of the administrative complaint was sent to Federated on June 2, 1999. Mr. Weems was officially terminated on June 21, 1999. He received his right to sue letter from the ICRC on November 9, 1999, and from the EEOC on December 1, 1999.

The Eighth Circuit recently summarized the standard for addressing challenges to whether a plaintiff has properly exhausted administrative remedies prior to suit:

"In determining whether an alleged discriminatory act falls within the scope of

a discrimination claim, the administrative complaint must be construed liberally 'in order not to frustrate the remedial purposes of [the anti-discrimination statutes]' and the plaintiff may seek relief for any discrimination that grows out of or is like or reasonably related to the substance of the allegations in the administrative charge." *Nichols [v. American Nat'l Ins. Co.]*, 154 F.3d [875,] 886–87 [ (8th Cir.1998) ] (citations and internal citation omitted). "Accordingly, the sweep of any subsequent judicial complaint may be as broad as the scope of the EEOC 'investigation which could reasonably be expected to grow out of the charge of discrimination.'" *Cobb v. Stringer*, 850 F.2d 356, 359 (8th Cir. 1988) (citation omitted). Allegations outside the scope of the EEOC charge, however, circumscribe the EEOC's investigatory and conciliatory role, and for that reason are not allowed. *Williams v. Little Rock Mun. Water Works*, 21 F.3d 218, 223 (8th Cir.1994) (citation omitted).

*Kells v. Sinclair Buick–GMC Truck, Inc.*, 210 F.3d 827, 836 (8th Cir.2000); *accord Meyer v. Iowa Mold Tooling Co.*, 141 F.Supp.2d 973, 983–84 (N.D.Iowa 2001) (emphasizing distinction, on notice grounds, between discriminatory or retaliatory conduct that occurs *after* the filing of an administrative charge and that which occurred prior to the filing but was not included within the administrative complaint: "[t]here is authority that the reasonably related test only applies to satisfy exhaustion of acts occurring subsequent to the filing of the administrative charge") (citations omitted).

Federated argues that Mr. Weems' claim of discriminatory discharge, not specifically mentioned in the administrative complaint, is outside the scope of the administrative charge and thus cannot be litigated in this action. Plaintiff counters that the termination amounts to further discrimination that grew out of or is like or reasonably related to the substance of the allegations in the administrative charge. The Court agrees with Plaintiff. Mr. Weems' administrative charge, construed liberally, is quite broad in its allegations. He included explicit charges of discrimination, harassment and retaliation. His supporting statements reference the allegedly racially discriminatory conduct he was subjected to by Mr. Daley and Mr. Hirsch and his belief that the two were intent on firing him, in part to evade investigation of Mr. Weems' allegations of discrimination. Those same actors were the key decision-makers in Mr. Weems' subsequent termination. *See Tart*, 31 F.3d at 673 (noting that scope of investigation into discriminatory discharge claim would have sought evidence *concerning the actions and motivations of the actor who made the termination decision*). Thus, the allegations underlying the discriminatory discharge claim were neither significantly separate in time nor distinct in kind from those alleged in the administrative complaint. Mr. Weems could therefore reasonably conclude that the subsequent termination would fall within the scope of the EEOC's investigation. This conclusion is bolstered by the fact that Mr. Weems was terminated only shortly after he filed his administrative complaint and thus well within the investigatory period contemplated by the ICRC and EEOC. *See Aramburu v. Boeing Co.*, 112 F.3d 1398, 1411 (10th Cir. 1997) ("The suit may include allegations of discrimination reasonably related to the allegations listed in the administrative charge, *including new acts occurring during the pendency of the administrative charge.*") (emphasis added); *Brown v. Continental Can Co.*, 765 F.2d 810, 812–13 (9th Cir.1985) (finding discriminatory discharge claim appropriately included in plaintiff's Title VII action because "his termination constituted a new act of alleged

discrimination that was reasonably related to and occurred during the pendency of his EEOC charge alleging discrimination in training" upon which a right-to-sue letter was issued). *Cf. Williams,* 21 F.3d at 223–23 (finding that discrimination allegations in administrative charge filed three years prior were not within scope of subsequent "highly specific" retaliation charge which "d[id] not even hint of a claim of race discrimination" and on which the plaintiff left the "race discrimination" box on the complaint form unchecked).[7]

■ Turning to Federated's substantive challenge to Plaintiff's Title VII claim, the Court must first resolve which analytical framework properly addresses Plaintiff's claim—the burden-shifting paradigm of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), or the direct-evidence standard of *Price Waterhouse v. Hopkins,* 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989). Where the allegations underlying the discrimination claim rest primarily on circumstantial evidence, *McDonnell Douglas* applies. Under that test, the plaintiff must first establish a prima facie case of discrimination by showing that he was a member of a protected class and suffered an adverse employment action that others outside his class did not suffer. *See, e.g., Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 120 S.Ct. 2097, 2105, 147 L.Ed.2d 105 (2000). The defendant may then offer legitimate, nondiscriminatory reasons for the challenged action. *Id.* (citing *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)). If the defendant meets his production burden, the plaintiff must prove by the preponderance of the evidence that the nondiscriminatory reasons offered by the defendant are not true, but instead were pretext for discrimination. *See id.* at 2106. Significantly, "[t]he 'ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Id.* (quoting *Burdine,* 450 U.S. at 253, 101 S.Ct. 1089).

In some situations, however, a plaintiff can produce direct evidence that an illegal

7. The cases cited by Federated are consistent with this conclusion. Those cases generally involve the attempted inclusion of harassment or retaliation claims not specifically mentioned in the administrative charge where the facts underlying those claims occurred *prior to* the filing of the administrative complaint. As noted, in those instances courts have held that the EEOC would not reasonably be apprised of the relationship between a discrimination claim and allegations of previously-occurring harassment or retaliation. *See, e.g., Tart,* 31 F.3d at 673 (claim of racial harassment is not reasonably related to racially discriminatory discharge); *Williams,* 21 F.3d at 223 (claim of race discrimination separate and distinct from claim of retaliation three years later); *Welsh v. City of Shawnee,* 182 F.3d 934, n. 3 (10th Cir. 1999) (finding no subject matter jurisdiction for Title VII sexual harassment claim where plaintiff's "harassment claims [were] based on completely different allegations from her gender discrimination claim" which was properly exhausted). Here, in contrast, the discriminatory discharge claim involves the same actors/decisionmakers as referenced in the administrative charge and the termination occurred following the filing.

Federated's reliance on federal regulations is also overstated. While Federated is correct that 29 C.F.R. § 1601.12(5)(b) permits amendment of an administrative charge "to cure technical defects or omissions," Defendants have not shown that amendment was necessary under the facts of this case where a reasonable conclusion is that the discriminatory discharge allegation is related to and/or grew out of the documented charges. Rather, the ability to amend a charge is relevant in those cases where the conduct to be added was distinct in kind or occurred prior to the filing of the charge but was inadvertently omitted—thus a plaintiff could then enlarge his allegations and avoid the conclusion reached in the cases discussed above.

criterion played a motivating role in the disputed employment decision. In those cases, the plaintiff is relieved of the ultimate burden of persuasion and the so-called "mixed motive" analysis is applied. *See generally Price Waterhouse*, 490 U.S. at 276–77, 109 S.Ct. 1775 (O'Connor, J., concurring). Under the mixed motive analysis, if the fact-finder concludes, based on the direct evidence, that a motivating factor in the disputed employment decision was race, "the defendant may avoid a finding of liability only by proving by a preponderance of the evidence that it would have made the same decision even if it had not taken the [illegitimate criterion] into account." *Kneibert v. Thomson Newspapers, Michigan, Inc.*, 129 F.3d 444, 451 (8th Cir.1997); *Yates v. McDonnell Douglas*, 255 F.3d 546, 548 (8th Cir.2001) ("[O]nce the plaintiff persuades a factfinder that, more likely than not, discrimination was 'a motivating part in an employment decision,' the burden shifts to the employer to prove that the employment decision would nevertheless have been made for legitimate, non-discriminatory reasons.").

Defendants argue that Plaintiff has failed to present direct evidence of discrimination and thus cannot benefit from the more plaintiff-friendly mixed motive analysis. Direct evidence is that which demonstrates "a specific link between the alleged discriminatory animus and the challenged [employment] decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated [the employer's] decision" to take the adverse employment action. *Thomas v. First Nat'l Bank of Wynne*, 111 F.3d 64, 66 (8th Cir.1997) (internal quotations omitted), *quoted in Deneen v. Northwest Airlines, Inc.*, 132 F.3d 431, 436 (8th Cir.1998). Not every

prejudiced remark made at work supports an inference of discrimination. Thus, stray remarks in the workplace, statements by nondecisionmakers, and statements by decisionmakers unrelated to the decisionmaking process have been "carefully distinguished" from "[c]omments which demonstrate a 'discriminatory animus in the decisional process' or those uttered by individuals closely involved in employment decisions." *Rivers–Frison v. Southeast Mo. Cmty. Treatment Ctr.*, 133 F.3d 616, 619 (8th Cir.1998) (quoting *Beshears v. Asbill*, 930 F.2d 1348, 1354 (8th Cir.1991) (in turn quoting *Price Waterhouse*, 490 U.S. at 278, 109 S.Ct. 1775)); *see also Kriss v. Sprint Communications Co.*, 58 F.3d 1276, 1282 (8th Cir.1995) (requiring evidence of "conduct or statements by persons involved in the decisionmaking process that may be viewed as directly reflecting the alleged discriminatory attitude ... sufficient to permit the factfinder to find that that attitude was more likely than not a motivating factor in the employer's decision"); *Gray v. University of Ark.*, 883 F.2d 1394, 1398 (8th Cir.1989) ("Direct evidence may include evidence of actions or remarks of the employer that reflect a discriminatory attitude."). The former do not merit direct evidence status while the latter do.

In this case, there is no question that additional supporting evidence—aside from Plaintiff's personal affidavit—would have been helpful. That said, however, on viewing the record in the light most favorable to Plaintiff, the evidence supports the following inferences relevant to the direct evidence determination:

Jeff Daley and Del Hirsch were responsible for the decision to hire (and ultimately to fire) Plaintiff. During one of his hiring interviews, Plaintiff was informed that only two African Americans had ever been hired as marketing representatives.[8]

---

8. Plaintiff also alleges, in his complaint and

by sworn affidavit, that he was first passed

During approximately the first six weeks of Plaintiff's employ, he was expected to participate in a number of group training courses as well as a customized training program with Mr. Daley. There appear to have been some problems even during this early period—with Plaintiff failing to follow through on paperwork and/or stay in close communication with Mr. Daley. In July 1998, following the completion of a training seminar, Mr. Daley met with Plaintiff to address concerns about Plaintiff's progress. Plaintiff states that during this meeting Mr. Daley warned him that just because he had made it through training did not mean he would make it with Federated. Plaintiff also alleges that the meeting deteriorated into a confrontation with racial undertones (although Plaintiff offers no specifics regarding this allegation). At some point during the confrontation, Mr. Daley became aware that Plaintiff was audiotaping their conversation.[9] Plaintiff asserts that Mr. Daley became enraged about the tape recording and, in the course of trying to get the device, assaulted Plaintiff—poking him in the chest and pulling on his wrist, thereby bruising Plaintiff's chest and exacerbating a wrist injury that Plaintiff had gotten during training.

The following day, Plaintiff was called to a meeting in Mr. Hirsch's office with Mr. Daley and Mr. Hirsch. He alleges that he was forced to undo his shirt and pants and pull up his trouser legs to "prove" that he was not recording the meeting before Hirsch and Daley would speak with him.[10] It is from this point on that the racially derogatory remarks allegedly began. According to Plaintiff, from then and until his termination, Mr. Daley repeatedly called him "nigger" and "buckwheat." On another instance, in May 1999, shortly before his termination, Plaintiff's pants split during a meeting, at which point Mr. Daley allegedly made an extremely offensive, racially derogatory remark about Plaintiff's genitalia. Plaintiff avers that his complaints to Mr. Hirsch regarding Mr. Daley's frequent derogatory racial comments went unanswered.[11]

The question becomes, then, whether Plaintiff has presented sufficient direct evidence by which a jury could conclude that race was a motivating factor in the decision to terminate him. On viewing the evidence in the light most favorable to Plaintiff, the Court concludes that the direct evidence bar has been met in this case. Significant in this conclusion is the fact that the key players in this case are so few in number. Defendant concedes that Mr. Daley and Mr. Hirsch made the decision to fire Plaintiff and the record demonstrates that Mr. Daley was intimately in-

over for the marketing representative position in favor of a less-qualified white candidate who quit after failing to pass a required exam. Plaintiff has produced no evidence regarding the other candidate's background and/or qualifications. There is nothing in the record to support Plaintiff's allegation that the white candidate was less qualified than Plaintiff and thus nothing from which a fact finder could rationally infer discrimination. Accordingly, the Court shall not consider this unsubstantiated allegation in determining whether the direct evidence bar has been met.

9. Plaintiff appears to take the position that his tape recorder was voice-activated and thus turned on by itself.

10. Additional details regarding the incident in Mr. Hirsch's office are discussed in conjunction with Plaintiff's emotional distress claim.

11. Plaintiff also contends that Mr. Daley and Mr. Hirsch placed stricter performance standards on him than on white marketing representatives. However, again there is nothing in the record to support this allegation. Accordingly, the Court will not consider this unsubstantiated allegation in the direct evidence analysis.

volved in the decisionmaking process with regard to Plaintiff's future with Federated. Moreover, the unclear chronology of events in May and June—shortly preceding Plaintiff's termination—further muddies any attempt to discern the "actual" motivation behind the termination decision. Thus, unlike many cases in which the mixed motive analysis is rejected despite racial comments in the record, here there was no "filter system" or time frame which could be said to have "sanitized" the discriminatory comments from the decisionmaking process. *Cf. Yates*, 255 F.3d at 549 (finding no direct evidence where, inter alia, the offensive comments were made approximately one to two years prior to the decision to terminate the plaintiff and stating that "[b]ecause the statements and the adverse employment decision were not close in time," the plaintiff "must establish a causal link between the comments and his termination") (citations omitted); *Philipp v. ANR Freight Sys., Inc.*, 61 F.3d 669, 674 (8th Cir.1995) (finding that one decision maker's "occasional reference" to the plaintiff as "the old man"

were no more than stray remarks because no evidence linked the remarks to the challenged employment decision). Rather, the racially derogatory comments were allegedly made to and about the Plaintiff throughout nearly the entire term of employment by "an individual closely involved in the employment decision[ ]." *Beshears*, 930 F.2d at 1354.[12]

■ Because Plaintiff has demonstrated direct evidence of racial discrimination, Defendants are entitled to summary judgment as to damages only if the evidence mandates a conclusion that Plaintiff would have been discharged even absent consideration of his race. Given the facts as described above, the Court is unable to conclude as a matter of law that Mr. Daley's allegedly consistent display of racial animus did not factor into the termination process. The Court does not deny that the record could support other conclusions and there is, without doubt, substantial evidence to suggest that there were nondiscriminatory reasons for the termination. In fact, the record is replete with docu-

---

**12.** Defendants also appear to argue that because the alleged racial comments denigrate Plaintiff "generally," they were not connected to the decisional process and thus do not constitute direct evidence. While it is true that direct evidence of employment discrimination "must have some connection to the employment relationship" *Rivers–Frison*, 133 F.3d at 619, the Court is persuaded that such a "connection" has been shown. If Mr. Daley's relationship with Plaintiff was permeated with racial animus, as alleged, the Court will not find an absence of direct evidence merely because the comments, although directed at and to Plaintiff throughout his employ, were not explicitly tied to aspects of his job performance—e.g., blacks can't sell insurance—but instead evidenced overall denigration of Plaintiff based on his race. *See Browning v. President Riverboat Casino–Missouri, Inc.*, 139 F.3d 631, 635 (8th Cir.1998) (finding that black employer's reference to the plaintiff as "that white boy" in the context of the plaintiff's employment warrants mixed-

motive analysis: "Such use of a racial slur by a supervisor and the principal decisionmaker in [the plaintiff's] termination constitutes more than a stray remark .... This comment did not simply evidence an awareness of the employee's gender or race, it reveals a decidedly negative attitude toward white people on the part of a person responsible for the employment decision.") (internal quotation and citations omitted). *Cf. Yates*, 255 F.3d at 549 (finding no direct evidence where offensive comments by supervisor occurred one to two years in advance of termination decision and thus "are therefore best classified as statements by a decisionmaker unrelated to the decisional process"); *Simmons v. Oce–USA, Inc.*, 174 F.3d 913 (8th Cir.1999) (no direct evidence where a white supervisor told one racially offensive joke and used the term "buckwheat" once during the course of the plaintiff's employment since the remarks were made two years before the decision to terminate and no causal connection was established).

mentation regarding Plaintiff's deficiencies in meeting purported minimal standards with regard to job performance. However, under the mixed motive analysis, the question is not whether the evidence could prove that discrimination was the sole or primary factor but rather whether it was a motivating factor.[13] The Court cannot conclude, given the nature of the relationship between the key parties and the alleged discriminatory comments and conduct, that race was not a motivating factor in the termination. This is particularly true given that at the time of the decision to terminate him, Plaintiff was in a performance enhancement program and had successfully completed at least a portion of it. It is undisputed that Plaintiff met the program goals for April and there is some confusion in the record as to his performance in May. Defendants sent him correspondence which stated he had successfully completed the May program as well. Defendants contend, however, that at some point in early June they learned that he had failed to meet the May standards and decided to terminate him. Viewing this evidence in the light most favorable to Plaintiff, it appears that Plaintiff may have been inexplicably terminated during a period in which he was meeting Federated goals and standards and receiving congratulations and support for those achievements. *See Simmons v. New Pub. Sch. Dist. No. Eight,* 251 F.3d 1210, 1215 (8th Cir.2001) (denying summary judgment in mixed-motive case where employer's arguments that the plaintiff was fired for her job performance were "for the finder of

fact, not for [the] court, to decide"). Accordingly, because Plaintiff has raised genuine issues of material fact as to whether impermissible race considerations played a motivating role in his termination, Defendants' summary judgment motion as to the Title VII claim is denied.

### Assault

■ Defendants challenge Plaintiff's assault claim on two grounds. First, they argue that Federated cannot be held vicariously liable for the alleged assault by Jeff Daley because any such assault would be outside the scope of Daley's employment as a matter of law. Second, Defendants argue that Plaintiff's unsubstantiated allegations are insufficient to generate a genuine issue of material fact on the assault claim.

■ Under Iowa law, an assault is committed when a person does: (1) an act intended to put another in fear of physical pain or injury; [or] (2) an act intended to put another in fear of physical contact which a reasonable person would deem insulting or offensive; and the victim reasonably believes that the act may be carried out immediately. *Greenland v. Fairtron Corp.,* 500 N.W.2d 36, 39 n. 4 (Iowa 1993) (citations omitted). Here, Plaintiff's assault claim is based on his version of an incident which occurred in July 1998 between Plaintiff and his supervisor, Jeff Daley.[14] Mr. Weems' affidavit describes the assault as follows:

> Prior to July 23, 1998, just after I had finished my training, I had an encounter

---

**13.** In the Eighth Circuit, a plaintiff's race was a "motivating factor" if his race "played a part in the defendant's decision to terminate him. However, [the] plaintiff's race need not have been the only reason for defendant's decision to terminate plaintiff." Model Instruction No. 5.96; *see also Deneen,* 132 F.3d at 435 ("Consistent with Title VII, an employer may be held liable for dismissing an em-

ployee on the basis of a mixture of motives, including some legitimate and some illegitimate consideration.") (citations omitted).

**14.** Plaintiff's complaint states that the assault occurred on June 15, 1998; the record suggests, however, that the meeting during which the alleged assault occurred actually took place in July 1998.

with Jeff Daley about my having made it through the training. Daley told me that while I had made it through the training, I wasn't going to make it with the company. I told him that his treatment of me was creating a hostile environment. While talking with him, Jeff Daley realized my tape recorder was on, recording our conversation. Jeff Daley became extremely agitated, and wanted my tape recorder. He grabbed me and struck me as he attempted to take my tape recorder away from me. Jeff Daley's physical contact with me resulted in injuries to me. I had a black mark on my chest that was there for many months. When he grabbed my wrist, he wrenched it and I felt it pop. My hand and arm were swollen and sore for many weeks. My wrist had previously been injured and Jeff Daley's grabbing of it exacerbated my problems. While I didn't seek immediate medical attention, I did [sic] with Dr. Roth. I wrote down what had happened and tried to give my report to Del Hirsch, but he wouldn't take it. Del Hirsch told me that if I wanted to keep my job, I was to destroy the tape and not talk to anyone about Daley's assault of me.

Weems affidav., at ¶ 9.

Under the doctrine of respondeat superior, an employer is liable for the conduct of an employee committed while the employee is acting within the scope of his or her employment. *Godar v. Edwards*, 588 N.W.2d 701, 705 (Iowa 1999); *Sandman v. Hagan*, 261 Iowa 560, 154 N.W.2d 113, 117 (Iowa 1967) ("It is well established in Iowa that under the common law the master and servant may each and both be liable for a servant's torts committed within the course of employment.") (citations omitted). "[F]or an act to be within the scope of employment the conduct 'must be of the same general nature as that authorized or incidental to the conduct authorized.'" *Godar*, 588 N.W.2d at 705

(quoting *Sandman*, 154 N.W.2d at 117). "The question, therefore, is whether the employee's conduct is so unlike that authorized that it is 'substantially different,'" or, stated another way, "'a deviation from the employer's business or interest to pursue the employee's own business or interest must be substantial in nature to relieve the employer from liability.'" *Id.* at 706 (quoting *Sandman*, 154 N.W.2d at 117–118). "[T]he ultimate question in determining whether an employee's conduct falls within the scope of employment is 'whether or not it is just that the loss resulting from the servant's acts should be considered as one of the normal risks to be borne by the business in which the servant is employed.'" *Id.* (quoting Restatement (Second) of Agency § 229 cmt. a). Whether an act is within the scope of employment is ordinarily a jury question, although, "depending on the surrounding facts and circumstances, the question as to whether the act which departs markedly from the employer's business is still within the scope of employment may well be for the court." *Sandman*, 154 N.W.2d at 118 (citations omitted); *Godar*, 588 N.W.2d at 706 (quoting *Sandman*).

Upon review of the record presented, the Court concludes that Plaintiff's theory of respondeat superior cannot be rejected as a matter of law. To the extent that Defendants argue for a per se rule that intentional torts of an agent cannot be imputed to the employer, the case law does not support such a rule. On the contrary, the case law clearly emphasizes that the inquiry in each case is a relatively fact-intensive one requiring a careful analysis of the scope of the alleged conduct in light of that reasonably foreseen by the employer. *See, e.g., Godar*, 588 N.W.2d at 706–07 (analyzing school district's vicarious liability for sexual abuse by teacher under the Restatement (Second) of Agency § 229(2) (1957), which lists ten "factors to be con-

sidered in determining whether conduct of an employee may be characterized as occurring within the scope of the employee's employment").

Such an analysis in this case raises at least a genuine issue as to whether Mr. Daley's alleged actions fell within the scope of his employment with Federated. Here, the employee at issue, Mr. Daley, was expressly charged with direct supervision of marketing representatives within his district, including Plaintiff. The record indicates that he worked frequently and intimately with those under his supervision to impress the importance of increasing Federated business. Further, the performance of the individual marketing representatives under Daley's supervision would likely have a direct bearing on Daley's reputation and advancement within Federated. Given this structure, it is at least reasonably foreseeable that the motivational methods contemplated in the fulfillment of Daley's duties would encompass potentially heated interactions with marketing representatives felt to be underperforming. It certainly cannot be said as a matter of law that Daley's alleged conduct was a "substantial deviation" from his duties as Plaintiff's direct supervisor or that it was "substantially different" in nature from that authorized by Federated. *See also Heuton v. Anderson*, 75 F.3d 357, 360 (8th Cir.1996) (finding potentially viable respondeat superior theory where USDA supervisor's duties included "communicating with, evaluating, and disciplining" employees and thus defamatory picture of employees allegedly posted by supervisor could have been construed as a disciplinary measure or, alternatively, a means of communicating the supervisor's official disapproval of the plaintiffs' performance); *Vlotho v. Hardin County*, 509 N.W.2d 350 (Iowa 1993) (finding fact question as to whether county engineer who was fired for unauthorized destruction of historic bridge was acting within scope of employment).

Defendants' reliance on two Iowa cases for their contention to the contrary is misplaced. Both *Riniker v. Wilson*, 623 N.W.2d 220 (Iowa Ct.App.2000) and *Sandman v. Hagan*, 261 Iowa 560, 154 N.W.2d 113 (Iowa 1967) are materially distinguishable and strongly support the Court's conclusion in this case that Federated cannot avoid vicarious liability. In *Riniker*, the plaintiff alleged respondeat superior liability against an employer for the sexual abuse of an employee's wife where the employee's job security was used as blackmail and sexual assaults occurred on the premises. *See id.* The Iowa Supreme Court affirmed the district court's finding in favor of the employer: "[the agent's] alleged conduct was so far removed from his duties with [the employer] that the question as to whether his actions departed markedly from [the employer's] business was properly determined by the district court". *Id.* at 232. The *Riniker* Court held that the supervisor's actions were a substantial deviation from his duties and were neither "necessary to accomplish the purpose of employment" nor "committed in the furtherance of his duties or the objectives of the corporation." *Id. Riniker* is consistent with other cases involving allegations of sexual abuse by agents of an employer. *See, e.g., Godar*, 588 N.W.2d at 706–07 (collecting cases and citing, *inter alia*, Richard Fossey and Todd A. Demitchell, "Let the Master Answer: Holding Schools Vicariously Liable When Employees Sexually Abuse Children," 25 J.L. & Educ. 575, 586 (1996) (noting that "courts are virtually unanimous in holding that school districts are not liable under agency principles for sexual assaults by school employees")); *see also Perrigo v. Harveys Iowa Management Co., Inc.*, 2000 WL 33363252 (S.D.Iowa 2000) (applying *Godar* to find no vicarious employer liability for

alleged sexual misconduct by restaurant manager against waitress). That said, a "rule" that acts of sexual abuse will almost inevitably be a substantial deviation from the purpose and contemplated duties of an employer imputes very little to the case at bar where the employer's agent allegedly assaulted an employee whom he directly supervised during a work-related confrontation. The two situations could not be more dissimilar and any generalizations as to the former certainly do not hold, as a matter of law, to the latter.

*Sandman,* the other case relied upon by Defendants, is also materially distinguishable. In *Sandman,* an employee engaged as laborer on a construction crew intervened in a fight that had broken out between another employee and a city inspector sent to check the ongoing work. *See Sandman,* 154 N.W.2d at 115–116. The Iowa Supreme Court held that the employer could not be held liable for the tort of its employee because the employee substantially deviated from the scope of his employment when he leapt into the ensuing fight and hit the inspector with a shovel. *See id.* at 118. Significant to the court's analysis, however, was the fact that the employee at issue was hired as a laborer on an outside crew with no supervisory duties whatsoever nor was it contemplated that his job would involve interaction or potential confrontation with others. *See id.* at 118–19. Further, the court noted the relevance of the parties involved in the fight and found that it certainly could not be deemed in furtherance of the employer's business for an employee to assault the city inspector assigned to okay the employer's work. *See id.* at 118. As with *Riniker,* the facts of the case at bar stand in stark contrast to *Sandman.*

■ Defendants' alternative argument—that Plaintiff cannot generate a triable issue as to the merits of his assault claim—also fails. On the record as it stands, and in the absence of evidence negating an essential element of his assault claim, Mr. Weems' affidavit alone is enough to generate a genuine issue of material fact thereby precluding summary judgment on the assault claim. *See* Fed. R.Civ.P. 56(e) ("When a motion for summary judgment is made ..., an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, *by affidavits or as otherwise provided in this rule,* must set forth specific facts showing that there is a genuine issue for trial.") (emphasis added). The assault allegedly took place in a closed room with only Mr. Weems and Mr. Daley present. The transcript of the tape recording of the incident is ambiguous at best. Still, at the very least, what remains is a sharp divergence between Mr. Weems' version of the incident, as set forth with specific facts in his sworn affidavit, and that of Mr. Daley who denies the assault took place. Such credibility determinations are not for the Court at the summary judgment stage. Accordingly, Defendants' motion for summary judgment with regard to the assault claim is denied.

### Intentional Infliction of Emotional Distress

■ Defendants argue that Plaintiff's claim for intentional infliction of emotional distress is preempted by the Iowa Civil Rights Act ("ICRA")[15] and/or, alternatively, fails on the merits as a matter of law. Plaintiff counters that his emotional distress claim is not dependent on a finding of

---

**15.** As noted in the introductory paragraphs of this opinion, Federated moved for summary judgment on Plaintiff's substantive discrimination claims brought under the Iowa Civil

Rights Act on the grounds that Plaintiff missed the 90 day statutory time period for bringing such a claim. Plaintiff has not resisted Defendants' motion on this point.

racial discrimination and thus is not preempted by the ICRA. Plaintiff further contends that genuine issues of material fact preclude summary judgment on this claim.

Iowa Code chapter 216 provides statutory remedies for enforcement of basic civil rights. The Iowa Supreme Court has repeatedly held that the remedies provided by the ICRA are exclusive and preemptive. *Greenland v. Fairtron Corp.*, 500 N.W.2d 36, 37 (Iowa 1993); *Vaughn v. Ag Processing, Inc.*, 459 N.W.2d 627, 639 (Iowa 1990); *Northrup v. Farmland Indus., Inc.*, 372 N.W.2d 193, 197 (Iowa 1985). Thus, "[p]reemption occurs unless the claims are separate and independent, and therefore incidental, causes of action." *Greenland v. Fairtron Corp.*, 500 N.W.2d 36, 37 (Iowa 1993). "The claims are not separate and independent when, under the facts of the case, success in the nonchapter [216] claims ... requires proof of discrimination." *Id.* (citations omitted).

 Here, then, Mr. Weems' claim for intentional infliction of emotional distress is preempted if he must prove discrimination to be successful. The elements of the tort of intentional infliction of emotional distress are: (1) outrageous conduct by the defendant; (2) the defendant's intentional causing, or reckless disregard of the probability of causing, emotional distress; (3) the plaintiff suffered severe or extreme emotional distress; and (4) actual and proximate causation of the emotional distress by the defendant's outrageous conduct. *Vaughn*, 459 N.W.2d at 635–36. Upon viewing the record in the light most favorable to Plaintiff, the Court concludes that, under the facts of this case, proof of discrimination is not essential to his emotional distress claim and thus Defendants' motion must be denied to the extent it rests on preemption grounds.

While much of the outrageous conduct alleged by the Plaintiff relates to discrimination, the "strip search" incident need not be construed as racially motivated. Mr. Weems alleges that because Mr. Daley and Mr. Hirsch suspected him of audiotaping a potentially confrontational meeting they ordered him to unbutton his shirt and pants and pull up his pant legs to "prove" that he wasn't wearing a taping device. The reason behind their actions, per Mr. Weems, was that at a meeting the prior day, Mr. Weems' voice-activated tape recorder recorded an assault against Mr. Weems by Mr. Daley. Thus, even if the initial assault was alleged or found to be racially motivated, the subsequent strip search could be found to be motivated solely by nondiscriminatory reasons—e.g., to prevent Plaintiff from documenting Daley and Hirsch's attempts to threaten Plaintiff against taking any remedial actions with regard to the alleged assault. In other words, the outrageous conduct could be construed neutrally as two supervisors conducting a strip search on an employee in order to intimidate and prevent the employee from making an incriminatory record regarding a prior alleged assault. Even if Plaintiff were to fail on his discrimination claim, these facts, construed in the light most favorable to Plaintiff, would not necessarily warrant failure of his claim for intentional infliction of emotional distress. *See Perrigo v. Harveys Iowa Mgmt. Co., Inc.*, 2000 WL 33363252, *9 (S.D.Iowa) (finding that supervisor's conduct in allegedly assaulting plaintiff could support a claim for intentional infliction of emotional distress independent of a separate finding of discrimination); *Grahek v. Voluntary Hosp. Coop. Assoc. of Iowa, Inc.*, 473 N.W.2d 31, 34 (Iowa 1991) (finding breach of contract claim not preempted by Chapter 216 where plaintiff was not an at-will employee: "Although [plaintiff] believes he was fired because of his age, he need not prove it to be successful in his contract ac-

tion.... [T]he claim of age discrimination is only incidental to the separate and independent cause of action for breach of contract."); *Vaughn v. Ag ·Processing, Inc.*, 459 N.W.2d 627, 639 (Iowa 1990) (holding that a contract claim which arose in the context of alleged discrimination was not necessarily preempted by Chapter 216).

■ Turning to Federated's alternative argument that Plaintiff's emotional distress claim fails on its merits, "[i]t is for the court to determine in the first instance whether the defendants' conduct may reasonably be regarded as so extreme and outrageous as to permit recovery." *Hanson v. Hancock County Mem. Hosp.*, 938 F.Supp. 1419, 1440 (N.D.Iowa 1996) (internal quotation marks and citations omitted). In *Hanson*, the district court summarized the state of Iowa law on this point:

> The allegation of outrageousness requires an extreme of egregiousness. *Van Baale [v. City of Des Moines]*, 550 N.W.2d [153,] 155 [ (Iowa 1996) ] ("To satisfy the first element a defendant's conduct must be extremely egregious."); *Taggart [v. Drake Univ.]*, 549 N.W.2d [796,] 802 [ (Iowa 1996) ] (same). In other words, the conduct complained of must be " 'so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society.' " *Reedy [v. White Consol. Indus., Inc.]*, 890 F.Supp. 1417, 1441 [ (N.D.Iowa 1995) ] (again quoting *Marks [v. Estate of Hartgerink ]*, 528 N.W.2d [539,] 546 [ (Iowa 1995) ], in turn quoting *Vinson v. Linn–Mar Community Sch. Dist.*, 360 N.W.2d 108, 118 (Iowa 1984)); *see also Dickerson [v. Mertz ]*, 547 N.W.2d [208,] 214 [ (Iowa 1996) ]; *Suntken [v. Den Ouden]*, 548 N.W.2d [164,] 168 [ (Iowa App.1996) ]. Thus, the Iowa Supreme Court has required an extreme of egregiousness to elevate (or downgrade) mere bad conduct to the level of outrageousness. *Northrup v. Farmland Indus., Inc.*, 372 N.W.2d 193, 198 (Iowa 1985). Indeed, the Iowa court has said that

> > [t]he tort law should encourage a certain level of emotional toughness. "The rough edges of our society are still in need of a good deal of filing down, and in the meantime plaintiffs must necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind." Restatement (Second) of Torts § 46, comment d, *supra.* "Against a large part of the frictions and irritations and clashing of temperaments incident to participation in a community life, a certain toughening of the mental hide is a better protection than the law could ever be." Magruder, Mental and Emotional Disturbance in the Law of Torts, 49 Harv. L.Rev. 1033, 1035 (1936).

> *Northrup*, 372 N.W.2d at 198–99 (quoting *Meyer v. Nottger*, 241 N.W.2d 911, 918 (Iowa 1976)). Peculiar susceptibility, by reason of physical or mental condition of the person affected, is a factor in considering whether conduct is outrageous, although "major outrage" is always the crucial element of the tort. *Cutler v. Klass, Whicher & Mishne*, 473 N.W.2d 178, 183 (Iowa 1991) (quoting Restatement (Second) of Torts § 46, comment f).

*Hanson*, 938 F.Supp. at 1440–41; *accord Fuller v. Local Union No. 106*, 567 N.W.2d 419, 423 (Iowa 1997) ("Before defendants' conduct can be considered outrageous, it must be 'so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized communi-

ty.' ") (quoting *Harsha v. State Savs. Bank*, 346 N.W.2d 791, 801 (Iowa 1984)).

This Court has spent a significant amount of time reviewing Iowa case law as to what constitutes outrageous conduct for purposes of surviving summary judgment. To the extent that Plaintiff's claim for intentional infliction of emotional distress is based on the alleged assault itself, that incident, as described by Plaintiff, falls far short of the egregiousness required by Iowa law. *See, e.g., Hanson*, 938 F.Supp. at 1441–42 (collecting over 15 Iowa cases where conduct found insufficiently outrageous as a matter of law and noting that "[f]ew cases can be located where an Iowa court actually held the conduct alleged was sufficiently outrageous"); *Vinson*, 360 N.W.2d at 119–120 (collecting over 20 cases and noting that the "outrageousness element requires substantial evidence of extreme conduct"). Thus, at issue is only the alleged "strip search" the day after the alleged assault. According to Plaintiff, he was summoned to Mr. Hirsch's Minneapolis office where he was confronted by Mr. Daley and Mr. Hirsch, upon whom he felt his job retention depended. In his sworn affidavit, Mr. Weems describes the meeting as follows:

> On July 24, 1998, Del Hirsch and Jeff Daley wanted to talk to me about the previous days [sic] events. Before they would talk with me, they forced me to open my shirt, unfasten my pants, and pull up my pant legs so that they could check to see if I had a recording device. I didn't. Being forced to remove my clothes was emotionally devastating. I was very embarrassed. While I didn't immediately call the police, I later went to the Waterloo police department and they took a statement from me. I also

went to the Blackhawk County Attorney's office and spoke with someone there, but I do not know if that was documented.[16]

Weems affidav., ¶ 8. In response to Defendants' deposition inquiry as to how Daley and Hirsch "forced" him to do the above, the following exchange occurred:

> A. "Because I was terminated if I didn't. . . . So when I walked in the door, the first thing he says, look—Jeff said this. He said, look, he's got a bug. He's got another one. Look at his pocket. And it was my money.[17] And he says, right now, he says. He says, strip right now. He says, he's got a bug, Del. And I look over at Del. I go, Mr. Hirsch. I look at him like. He said, you heard him, didn't you? And then that was when Jeff says, if you don't do it, you're terminated. . . .
>
> Q. Did you ask for further instruction about what they meant? Do you want me to empty my pockets or -
>
> A. Yes, he told me—yes, he told me, he says—he says, I want to see it all. And when he—when I started unbuttoning my shirt, they started laughing. That was a real snicker. So I opened my shirt up. I turned around, showed that I didn't have anything taped up to me. Then I went and emptied my pockets, put all the money on the table, my keys. Okay. I looked around, showed them I didn't have anything. Then I unzipped my pants. They started laughing. Then turn around. And I turned around. They saw that. Then they had me lift up my—my pants legs. And then it was real big joke. Then they say ha, ha, ha. And then he sat back down.
>
> Q. Okay, and then you got dressed?

---

16. Plaintiff has not included documentary evidence of either his statement to police or his meeting with the Blackhawk County Attorneys' Office.

17. According to Mr. Weems' deposition testimony, his pockets were bulging because he carried a considerable amount of rolled-up cash in case he had car problems.

A. I actually—I mean, as good as possible."

Weems depo., p. 168–170.

Whether Plaintiff's allegations in this case survive Iowa's "outrageous conduct" standard is a close question. However, on review of the case law, the Court is persuaded that Plaintiff's allegations, even viewed in the light most favorable to him, fall short of that bar. Taking Plaintiff's allegations as true, Plaintiff's supervisors' conduct was highly inappropriate, and their concerns about unauthorized audiotaping could certainly have been handled differently. That said, however, there was a legitimate basis for those concerns in light of the fact that Plaintiff had, without permission, recorded a meeting with Mr. Daley just one day before. Further, based on his own sworn testimony, Plaintiff appears to have defined at least some of the scope of the search himself—particularly with what would be regarded as the most potentially outrageous aspect, i.e., when he unzipped his pants. There is no evidence that either Mr. Daley or Mr. Hirsch asked him to unzip his pants after emptying his pockets nor does it necessarily follow that they would have demanded it since the concern appears to have been with the "bulges" in Plaintiff's pocket. The Court is also constrained to acknowledge that Plaintiff could have refused to participate in the search; i.e., Plaintiff could have left the meeting and, if terminated because of it, had recourse to the same legal remedies he seeks now. Although the Court recognizes that Plaintiff felt dependent on Daley and Hirsch for his job, the Court questions whether this type of economic pressure can be characterized as "force" so as to fully insulate Plaintiff from his decision to continue with the meeting instead of leaving. Numerous Iowa cases have found insufficient evidence of outrageous conduct even where an employee was threatened with termination, or even terminated, by an employer with what could be character-ized as petty or malicious motives and actions. *See, e.g., Vinson,* 360 N.W.2d at 118 (finding insufficient evidence of outrageous conduct even where employer conducted extended and persistent campaign of badgering and harassing employee before discharging her on grounds of dishonesty and reporting employee's dishonesty to a prospective employer *even though employer knew that plaintiff had not been dishonest* ); *Northrup,* 372 N.W.2d at 198–99 (firing employee for alcoholism *after* employee's return from treatment program was not sufficiently outrageous to establish triable issue).

In sum, even if the Court agrees that a partial "strip search" (including the threat of termination on noncompliance) of an employee to disprove the presence of a suspected recording device is "wrong," under the facts of this case that search did not exceed "all bounds of decency." Clearly, Daley and Hirsch were attempting to intimidate Plaintiff by bullying him, sniggering at him, and/or demonstrating the economic power they held over his job future with Federated. That said, however, there are no allegations of physical force by either of them on this occasion nor was Plaintiff physically prevented or blocked from leaving Mr. Hirsch's office had he so chosen. Relevant here are the Iowa Supreme Court's words in *Vinson:*

> Even though we believe a jury could find defendants engaged in a deliberate campaign to badger and harass plaintiff, we do not believe their conduct rises to the level of extremity essential to support a finding of outrageousness. The jury could find that defendants' actions were petty and wrong, even malicious, but we do not believe a trier of fact could reasonably conclude that the conduct went beyond all possible bounds of decency and must be regarded as atrocious and utterly intolerable in a civilized community.

*Vinson*, 360 N.W.2d at 119. *See also Van Baale v. City of Des Moines*, 550 N.W.2d 153, 157 (Iowa 1996) (noting that "outrageous conduct" standard "is not easily met, especially in the employment cases").

As in *Vinson*, the challenged actions in this case may be characterized as petty, wrong and even possibly malicious. However, the Court is persuaded that no trier of fact could reasonably conclude that the conduct of Daley and Hirsch, when distilled to its essence, went "beyond all possible bounds of decency and must be regarded as atrocious and utterly intolerable." *See, e.g., Taggart v. Drake Univ.*, 549 N.W.2d 796, 802 (Iowa 1996) (plaintiff failed to satisfy outrageousness element where, during meeting, academic dean/supervisor lost his temper, yelled at plaintiff in sexist and condescending matter, and "while verbally berating her, . . . gut up and out of his chair and leaned over the table glaring at her in a threatening manner" which was intended and did cause her physical fear and anxiety). Accordingly, Defendants motion for summary judgment on Plaintiff's claim for intentional infliction of emotional distress is granted.[18]

## IV.

In sum, the Court concludes that Defendants' motion should be denied in part and granted in part. Genuine issues of material fact preclude summary judgment as to Plaintiff's Title VII claim against Federated and his assault claim against Federated and Jeff Daley. Accordingly, Defendants' motion as to counts I and III will be denied. Defendants' challenge to Plaintiff's state-based civil rights claim is unresisted, however, and Defendants have shown entitlement to summary judgment on Plaintiff's claim for intentional infliction of emotional distress. Accordingly, Defendants' motion as to counts II and IV will be granted.

## ORDER

In accordance with the opinion issued herewith, it is ORDERED:

Defendant's motion for summary judgment is Granted in part and Denied in part, as follows:

(1) With regard to Plaintiff's Count I, brought pursuant to 42 U.S.C § 2000e et seq., Defendants' motion is Denied.

(2) With regard to Plaintiff's Count II, brought pursuant to the Iowa Civil Rights Act, Iowa Code, ch. 216, Defendants' motion is Granted.

(3) With regard to Plaintiff's Count III, a state-law assault claim against Federated and Jeff Daley, Defendants' motion is Denied.

(4) With regard to Plaintiff's Count IV, a state-law intentional infliction of emotional distress claim against Federated, Jeff Daley and Del Hirsch, Defendants' motion is Granted.

---

**18.** The Court also notes an absence in the record of evidence regarding Plaintiff's "emotional distress" as a result of the alleged strip search. The Iowa Supreme Court has established stringent standards for this element of the tort as well and "the law intervenes only where the distress inflicted is so severe that no reasonable [person] could be expected to endure it." *Tappe v. Iowa Methodist Medical Ctr.*, 477 N.W.2d 396, 404 (Iowa 1991) (internal quotations omitted), *quoted in Hanson*, 938 F.Supp. at 1442. However, because Defendants have not specifically addressed this element in their summary judgment challenge, the Court will not rely on it in granting Defendants' motion on this claim.